[Civ. No. 21333. First Dist., Div. One. Feb. 15, 1965.]

JOHN A. MARSHALL, Plaintiff and Respondent, v. GARD-
NER MARSHALL et al., as Executors, etc., Defendants
and Appellants.

Berry, Davis, Lewis & McInerney, Robert M. Davis and Richard G. Logan for Defendants and Appellants.

Joseph L. Alioto and Walter F. Calcagno for Plaintiff and Respondent.

SULLIVAN, P. J.—Defendants appeal from a judgment declaring plaintiff to be the sole owner of certain real property in Santa Barbara subject to a lien in favor of defendants for reimbursements in the amount of $3,179.79.

The present action was commenced on November 9, 1954, by plaintiff against his mother Emily V. Marshall to impress a constructive trust on the subject property. Basically, the dispute between son and mother revolves about real property in Berkeley, California, known as the Casa Bonita Apartments, subsequently exchanged for the Santa Barbara property. The case has been tried three times. Judgment entered after the first trial in 1956, determining that each of the parties was entitled to an undivided one-half interest in the property was reversed by Division Two of this court. (*Marshall* v. *Marshall* (1958) 165 Cal.App.2d 669 [332 P.2d 107].) [1] In the meantime defendant Emily V. Marshall had died on June 10, 1956. Thereafter the special administrator of her estate and finally the executors of her will, defendants herein, were substituted as defendants in the action.

The case was tried for the second time before another judge in 1959. He signed a memorandum opinion and interlocutory decree which awarded the property to plaintiff but retired from the bench without having signed findings of fact, conclusions of law and a final judgment. The case was therefore ordered to be retried, resulting in the judgment which we now review.

We set forth the facts in accordance with the settled rule that an appellate court will view the evidence in the light most favorable to the respondent and will indulge in all intendments and reasonable inferences to sustain the findings and the judgment. (*Peterson* v. *Grieger, Inc.* (1961) 57 Cal.2d 43, 51-52 [17 Cal.Rptr. 828, 367 P.2d 420]; *McCarthy* v. *Tally* (1956) 46 Cal.2d 577, 581 [297 P.2d 981]; *Berniker* v. *Berniker* (1947) 30 Cal.2d 439, 444 [182 P.2d 557]; *Monell* v. *College of Physicians & Surgeons* (1961) 198 Cal.App.2d 38, 47-48 [17 Cal.Rptr. 744]; *Clark* v. *Redlich* (1957) 147 Cal. App.2d 500, 504 [305 P.2d 239].)

In 1927 plaintiff purchased from his mother an unimproved lot in Berkeley upon which he thereupon built the

---

[1]The court stated that "whatever might be the sufficiency of the evidence to support an award of the whole property to either party, it is clear that no evidence whatever supports the award of a half interest to each. The oral testimony runs only to the total interest." (165 Cal. App.2d at p. 671.)

Casa Bonita Apartments. Legal title to this property remained in plaintiff until 1935. After refinancing, the property was subject to the following encumbrances: a first deed of trust securing a $50,000 loan to plaintiff from the Prudential Insurance Company of America and a second deed of trust securing plaintiff's indebtedness to his mother in the amount of $32,600.[2]

In 1931 plaintiff acquired property at Pyramid Lake, Nevada, which he operated as a resort. However he continued to live in Berkeley until 1932 when he moved to Nevada in order to manage the resort and eventually try to sell it. At about this time, as additional security for the obligations which Mrs. Marshall held against him, plaintiff transferred to her the possession of the Casa Bonita Apartments and authorized her to collect the rents. During the years 1932 to 1935, while plaintiff was in the resort business at Pyramid Lake, there was certain correspondence between the parties. In some of these letters, according to plaintiff, his mother spoke "about the apartment house going to pieces and running downhill and making a great deal of work, and then she started in to ask me if I would turn the apartment house over to her *while I was in this business.* She felt it was risky, . . ." (Italics added.) In substance Mrs. Marshall said: "[T]urn the apartment over to me while you are up at Pyramid Lake; it will be in safekeeping and you can trust your mother, and when you come back *I will turn it back to you.*" (Italics added.) Mrs. Marshall did not deny the occurrence of these events or the statements attributed to her. Mrs. Oliphant, her bookkeeper, confirmed that the parties had corresponded while plaintiff was in Nevada.

Plaintiff had stored all of these letters in the basement of the Casa Bonita in 1940 but when he made a search for them in 1954 after the present dispute arose, there was no trace of the boxes and trunk in which the letters and other personal belongings were placed.

On July 9, 1935, while in Nevada, plaintiff executed three documents: (a) a grant deed conveying the Casa Bonita property to his mother; (b) an affidavit referring to such conveyance and declaring that it was absolute;[3] and (c) an

---

[2]Mrs. Marshall was also jointly and severally liable with plaintiff on the Prudential loan.

[3]The affidavit states that the transfer of the real property includes the furniture, furnishings, fixtures and equipment of the Casa Bonita. It also states: "The aforesaid transfer is absolute and is made in

agreement between Mrs. Marshall and himself providing that if the former "sells the property at a profit, the profit shall be equally divided."[4] All three documents had been prepared by Mr. George Clark, who had been Mrs. Marshall's attorney for a number of years and who was advising both plaintiff and his mother at the time.

Plaintiff testified that the reason for the execution of all three documents was to protect him from his creditors in connection with the Pyramid Lake venture. Neither mother nor son was able to recall at the trial the precise reason for the profit-sharing agreement.[5] Plaintiff testified that he had no discussions with his mother about the agreement before he signed it and that he probably signed it because Mr. Clark must have indicated it was necessary for his protection. Mrs. Marshall had no recollection whatsoever of the profit-sharing agreement. Mr. Clark testified that he prepared all three documents at Mrs. Marshall's request and that the latter probably sent them to plaintiff who was in Nevada at the time. Although he stated that the various documents were drawn to protect Mrs. Marshall rather than plaintiff, he acknowledged that the reason for the 1935 transfer to Mrs. Marshall was that "Mr. Marshall was running the Casa Bonita Apartments and he was going over there to run this Pyramid Lake resort" and that at about the time of the

---

consideration of the cancellation of the indebtedness secured by said second deed of trust. . . . The indebtedness cancelled is equal to the value of the property conveyed, the consideration is adequate and I am retaining no interest whatsoever in the property transferred. The absolute title to the said real and personal property is transferred to EMILY V. MARSHALL."

[4]The agreement after referring to the transfer of the real and personal property stated that in consideration of the grant the mother is releasing plaintiff from the second deed of trust indebtedness and that the mother, being already liable upon the first deed of trust indebtedness, assumes full responsibility for the unpaid balance thereof and agrees to hold plaintiff harmless therefrom. Mrs. Marshall's promise to divide the profit from any sale is made subject to the conditions that such undertaking "shall create no interest in the property"; "will create no trust of any kind whatsoever" in favor of plaintiff; that the mother's powers with respect to the property "shall be at all times that of an absolute owner" and her title to both real and personal property "is to be that of title in fee simple absolute"; and that such undertaking shall neither be enforceable against Mrs. Marshall's estate nor give rise to any claim against her estate or its property. The agreement provides in detail for the method of determining any profit to be divided.

For convenience we hereafter refer to this agreement as the "profit-sharing agreement."

[5]As noted above, Mrs. Marshall died shortly after the first trial. Her testimony introduced at that trial was received in evidence at the third trial.

transfer "There may well have been" a discussion about plaintiff's Nevada business being a speculative and somewhat dangerous one.[6] Although Mr. Clark recorded the 1935 grant deed for Mrs. Marshall, he never recorded the profit-sharing agreement.

On August 1, 1936, approximately a year later, plaintiff sold his property at Pyramid Lake and returned to Berkeley. He moved back into the Casa Bonita and at his mother's request paid rent on the apartment which he occupied. He continued to do this regularly as long as he was there.

Mrs. Marshall kept records showing the net income or loss from the Casa Bonita during the period 1932[7] through 1940. The trial court received in evidence two ledger sheets containing entries to this effect which were maintained for Mrs. Marshall by Mrs. Maybelle Oliphant, her bookkeeper for over 25 years. In reference to these records, Mrs. Oliphant testified on cross-examination by plaintiff's counsel[8] that plaintiff was credited with the entire (and not merely one-half of) income of the Casa Bonita after July 9, 1935, the date of execution of the aforementioned deed and the other two documents. She did not consider the credit entered under an account captioned "J. A. Marshall, Jr." as a credit to John Marshall "the personality" but at Mrs. Marshall's request "I just set it up in the event—in the event that Albert did not waive his rights to it, that his mother would have a picture of the true condition of the—of the apartment house and that was all that it was set up for. It was never set up for any other purpose."[9] The ledger sheets in question (plain-

---

[6]The witness further stated: "I think I knew, and I think every attorney of any experience knows, how speculative an investment is which is made in summer resort property." It must be emphasized however that Mr. Clark at all times stated that so far as he knew the 1935 transfer was an absolute one as reflected by the documents and did not concede that it was made for the purpose claimed by plaintiff.

[7]As noted *supra*, in 1932, plaintiff authorized his mother to collect the rents.

[8]Mrs. Oliphant testified at the *second* trial in 1959. She was dead at the time of the third trial and a transcript of her previous testimony was received in evidence.

[9]She also testified: "I believe . . . that was done until there was a complete waiver—Mr. Marshall—Mr. Marshall had an agreement with his mother and that was kept up to the time that he waived all rights to the Casa Bonita and then it was discontinued. It was done for that purpose. You see, there were strings attached while Mrs. Marshall had the deed. . . . She also had an agreement with Albert that—that if she made anything off the apartment that she wanted him to have something of it."

tiff's exhibit 30) contains, among others, entries *crediting* plaintiff with all of the income from the Casa Bonita from January 1, 1935, to December 31, 1938, and also *charging* him with expenses, interest on and the unpaid balance of the Prudential Insurance Company loan. At the bottom of the ledger sheet containing these entries (p. 70a of plaintiff's exhibit 30) appears the pencilled notation: "(Not a portion of books) (Reference sheet only) To be used only if J A M II fails to sign waiver of title to Casa Bonita Apts as retained in original agreement of transfer to E.V.M." Directly beneath it but in ink appears the following: "Discontinued statement upon receipt of Waiver." Mrs. Oliphant testified that such entries were in her handwriting and that the mother gave her the information on which she based the statement which she wrote in pencil. The record does not disclose *when* these notations were made on the ledger sheet in question. In reference to the above notations, she also testified that although title to the Casa Bonita was in Mrs. Marshall's name, the latter had made an agreement with her son which she wanted waived—"The agreement was that if she made any money on the apartment . . . she would take care of Albert . . . I mean, she would have been entitled to her share of her equity in the apartment instead of the rental all being credited to Albert." She stated that in crediting the income in full to plaintiff throughout the years 1936 to 1938 she was handling it in the same way as it was credited from 1931 until the date of the grant deed in 1935.

Nevertheless, as plaintiff admitted at the trial, from the time of the 1935 transfer of the apartment house to his mother until it was finally sold in October 1953, he never reported the income from such property on any of his income tax returns or paid any tax thereon.

When plaintiff sold his Nevada property, he did not ask his mother for the return of the apartment house. "I spoke to my mother and she said she still needed money. I let her keep it. I didn't need the money, myself." However in the early part of 1938, he demanded, apparently by letter, that she return the property to him. Her reply, also by letter through her attorney Mr. Clark, was to the effect that she had made provision in her will to turn the apartment house back to him. Plaintiff was satisfied with this reply and did not then press the matter further. This was the only occasion on which plaintiff asked for the return of the property until after it was sold in October 1953, some 15 years later.

In 1940 plaintiff acquired the properties known as the Castlewood Country Club in Pleasanton, California, and later known as the Old Hearst Ranch. Mr. Clark, who acted as his attorney in the purchase of the property, had advised plaintiff not to go into the venture. Mr. Clark testified[10] that as Mrs. Marshall's attorney he advised her that before plaintiff became involved in the Castlewood Country Club venture "he should sign off completely with respect to that 1935 contract" (the profit-sharing agreement) otherwise the creditors of Castlewood "could come onto that profit-sharing contract, try to reach it and get something out of Casa Bonita." Mr. Clark then prepared an agreement executed by mother and son on April 16, 1940, and referred to in the record as the "1940 quitclaim." Although plaintiff had no conversation with his mother about the agreement and was not requested by her to sign it, he stated Mr. Clark advised him to do so for his own protection in order "to insulate me against creditors when they came, and he was certain they were going to come."

On May 1, 1931, plaintiff had borrowed $15,000 from his mother in order to finance his Pyramid Lake, Nevada, venture which he repaid in 1936 when he sold the Pyramid Lake property, but there is no evidence that plaintiff paid any interest on that loan. Mr. Clark testified that in advising Mrs. Marshall on the necessity of the quitclaim agreement he told her that the agreement should contain a waiver by her of any claim against plaintiff for interest on the above loan, stating that plaintiff's failure to pay it "had always been a sore spot with Mrs. Marshall." Plaintiff testified that the question of paying interest on that loan was never discussed and that it was understood his mother would take it out of the apartment house income.

The 1940 quitclaim agreement, after making reference to the 1935 transfer of the Casa Bonita, the settlement of Mrs. Marshall's loan to plaintiff, her claim to "certain interest" on the loan, recites that in the Casa Bonita contract "it was understood that such contract did not, in any way, affect the absolute title of EMILY V. MARSHALL to such property. The parties are desirous of eliminating all question of right that might be claimed in connection with any of the foregoing transactions." After these recitals the agreement pro-

---

[10]Mr. Clark was dead at the time of the third trial. His testimony received at the first trial was received in evidence.

vides that plaintiff "hereby quit claims to EMILY V. MAR-
SHALL all right, title or interest that he has, or that he might
claim in the aforesaid Casa Bonita real and personal prop-
erty and all demands that he might make on account of any
contracts or dealings between himself and Emily V. Marshall
with respect to said real and personal property." The agree-
ment then concludes: "EMILY V. MARSHALL hereby acknowl-
edges as of this date that she has no claim or demand as
against JOHN ALBERT MARSHALL on account of any of the
transactions hereinbefore referred to. Each party agrees that
all the rights of such party against the other party, present
or prospective, by virtue of any contract or otherwise, are
renounced and hereby settled."

Plaintiff lived at the Old Hearst Ranch (formerly Castle-
wood Country Club) from 1940 until he sold it on November
13, 1952. During this time he saw his mother about three
times every two weeks, the latter having visited him there
on many occasions, remaining overnight and sometimes for
periods of two or three days. They also made trips together.
Sometime in 1948, plaintiff had a conversation with Mr. Clark
about the Casa Bonita while the attorney, who was repre-
senting plaintiff at the time on an unrelated matter, was
visiting at the Old Hearst Ranch. Plaintiff told Mr. Clark
that the apartments were his. The attorney cut him short and
refused to discuss the matter with plaintiff. Mr. Clark testi-
fied (see fn. 10, *ante*) that on this occasion he told plaintiff
that he, Clark, had been the mother's attorney in all matters
connected with the Casa Bonita and that he was not going to
discuss the matter with plaintiff. Mr. Clark thereupon got
out of plaintiff's automobile and walked back to Pleasanton
by himself.

In October 1953, Mrs. Marshall, without plaintiff's knowl-
edge, traded the Casa Bonita Apartments for certain property
in Santa Barbara. The record shows the following: By deed
dated October 9, 1953, and recorded November 6, 1953, she
conveyed the Casa Bonita to one Estelle R. Davis. By deed
dated October 22, 1953, and recorded November 6, 1953, she
received a conveyance from one Louis Osbourne of the real
property which is the subject of the judgment now before us.
However, although the parties continued to see each other
during the rest of the year 1953, Mrs. Marshall never told
her son about the disposition of the Berkeley property. At a
birthday party given by plaintiff for his mother in January
1954, he expressed his opposition to any sale of the Casa
Bonita, but neither his mother nor his brother Elliot, who

were present at the conversation, made any mention of the sale. Two days later plaintiff wrote his mother a letter "to curtail, cut short and stop any ideas which you have . . . about selling or trading Casa Bonita Apartments. . . . What you do in regard to other properties, money or assets which you may have, is entirely up to you. . . . Casa Bonita is as good an investment as is possible, in times of depression, and therefore I insist and demand that you hold on."

About a month later plaintiff first received information about the sale of Casa Bonita from a Mr. Schoening. Plaintiff immediately telephoned his mother and reported that he had heard that she was intending to dispose of Casa Bonita but his mother insisted that "there is no such thing, Albert, you don't have to worry about that." The matter was not discussed again until May of 1954 when plaintiff, his wife and his mother were at dinner. Plaintiff there announced to his mother that since he feared that she would turn the Casa Bonita Apartments over to other members of the family he wanted the deed back although he intended to leave the income with his mother. The mother replied, "It isn't your apartment, it is mine."

Plaintiff received a letter from his mother dated June 4, 1954, in which she declared "Last November I made a wonderful trade and could not talk last evening, as it would be too great a shock in the state you were in. I made the best buy in Santa Barbara. . . . Santa Barbara will do wonders for you and you must know that I do not want a break anywhere and you will thank me later, as I want you and Edith as a son and daughter and still love you both."

On receipt of the above letter, plaintiff immediately telephoned his mother in Santa Barbara and told her "that was my apartment house and she had no right to trade it and I wanted that back or its equivalent." His mother replied that her new acquisition was a good investment and that plaintiff would be taken care of. But she also asked plaintiff if he would be satisfied with $500 a month, whereupon plaintiff told her that he would not and that he wanted the apartment house back.

Plaintiff did not hear from his mother again until late in June 1954, when plaintiff and his wife went to Santa Barbara apparently to see her. After plaintiff attempted to ascertain her whereabouts through his brother Elliot, at Mrs. Marshall's request the parties met in the office of a Santa Barbara attorney. At the meeting, plaintiff asked his mother "just

how she figured that apartment was hers.'' Mrs. Marshall refused to talk. The next day the parties had a conversation in the presence of plaintiff's wife, his brother, the latter's wife, and Mrs. Jewett, Mrs. Marshall's companion, in the course of which Mrs. Marshall asked plaintiff whether he would be satisfied if she gave him $60,000. He replied that he wanted his apartment house back and that he would support her for the rest of her life.

Plaintiff received a *Christmas* card from his mother mailed to him on *July* 30, 1954,[11] from Santa Barbara which states: ''I think I have just as much sentiment concerning Casa Bonita as you have, and when the bombs come there will be no apartment—nothing but ruins and a complete loss. I haven't wanted to disturb you before Christmas but I did what I thought best to save what I could by trading the apmt. [*sic*] for a business store in Santa Barbara. . . . The U.C. would take over all in 2 or three years *so then you would be helpless*. . . .'' (Italics added.)

The trial court found, so far as is here pertinent, that in 1935 and prior thereto plaintiff was in a speculative business operation in Pyramid Lake; that on or about July 9, 1935, he transferred to his mother as a protective measure the bare legal title to Casa Bonita; that the purpose of the transfer was to protect the Casa Bonita from possible creditors of plaintiff due to the highly speculative nature of the Nevada venture and to provide his mother with additional security for advances made by her to plaintiff; that the purpose of the transfer was *not* to relieve her of financial responsibility and to provide her with income; that plaintiff retained the equitable interest in the Casa Bonita and the documents executed in 1935 did not constitute an absolute transfer to the mother; that she accepted the 1935 deed as a trustee and with a promise to reconvey; that she violated this trust during her lifetime; that because plaintiff's Castlewood Country Club venture was a potentially hazardous financial undertaking, plaintiff executed the 1940 quitclaim document, the reasons for its execution being essentially the same as those obtaining when the 1935 documents were executed; that the consideration for it ''if any there was, consisted in providing additional security of the mother and the protection of plaintiff's interest in

---

[11]Mrs. Marshall testified that she wrote the card shortly after her birthday party in January 1954 but postponed mailing it for about six months ''Well, just perhaps to refuse hurting my son's feelings about the selling or trading of the property.''

CASA BONITA as against possible future creditors of his";
and that there was a relationship of complete trust and con-
fidence between plaintiff and his mother during all of the
period involved and up to June 1954.

The court further found that Mrs. Marshall traded the Casa
Bonita for the Santa Barbara property "on an even basis";
that the value of the Casa Bonita in 1935 was $77,000; that at
no time was the Casa Bonita in financial difficulty and that at
all times the income therefrom was sufficient to pay off all
encumbrances; that the 1953 transfer of the Casa Bonita was
concealed from plaintiff and he did not learn of it until June
1954; and that plaintiff's cause of action was not barred by
laches or by the statute of limitations.

The court concluded that plaintiff was the sole owner of
the Santa Barbara property; that defendants were entitled to
have a lien on said property in the amount of $3,179.79 as
calculated by certain certified public accountants according
to a detailed formula prescribed by the court; that plaintiff
was entitled to all of the rents, issues and profits of the Santa
Barbara property; and that the documents executed by plain-
tiff and his mother in 1935 and 1940 "are hereby declared
void." Judgment was entered accordingly.

We are satisfied that the evidence summarized by us above,
together with reasonable inferences therefrom, supports the
determination of the trial court that plaintiff transferred to
his mother only the bare legal title to the Casa Bonita, that
neither the documents executed in 1935 nor the document
executed in 1940 constituted an absolute transfer of the above
property and that plaintiff at all pertinent times remained the
equitable owner thereof. The evidence on the central issue
whether or not the transfer in question was absolute was in
sharp conflict.[12] This conflict was resolved by the trial court.
It is not our province to reweigh the evidence, to analyze
the conflicts in the evidence or to speculate as to whether it
is susceptible of more reasonable inferences. (*Berniker* v.
*Berniker, supra,* 30 Cal.2d 439, 444.)

----

[12]The trial judge, Honorable Leonard Dieden, states in his memoran-
dum decision "Although the evidence is sharply conflicting and is sus-
ceptible of more than one inference, the Court finds that the purposes
of the 1935 deed from plaintiff to his mother was to protect the Casa
Bonita Apartments from possible creditors of plaintiff due to the highly
speculative nature of the Nevada venture, and also to provide the mother
with additional security for the sums she advanced to her son, the plain-
tiff. The plaintiff retained the equitable interest in Casa Bonita and
the documents executed in 1935 did not constitute an absolute transfer
of the property to the mother."

246

In their attack on the sufficiency of the evidence, defendants take the position that as a matter of law the trial court erred in concluding that Mrs. Marshall held the Casa Bonita as a trustee. According to their claim the pertinent evidence demonstrates that plaintiff did not meet the burden of establishing the oral agreement underlying the trust by "full, clear and convincing evidence." Defendants seemingly ignore the well-settled principles which govern our review. ■ "When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact." (*Primm* v. *Primm* (1956) 46 Cal.2d 690, 693 [299 P.2d 231]; *Estate of Arstein* (1961) 56 Cal.2d 239, 240 [14 Cal.Rptr. 809, 364 P.2d 33]; *Estate of Bristol* (1943) 23 Cal.2d 221, 223 [143 P.2d 689]; *Crawford* v. *Southern Pac. Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]; *Walton* v. *Bank of California* (1963) 218 Cal.App.2d 527, 539 [32 Cal.Rptr. 856]; *Monell* v. *College of Physicians & Surgeons, supra,* 198 Cal.App.2d 38, 48.)

■ Although it is incumbent upon one establishing a constructive trust to present full, clear and convincing proof (*Fowler* v. *Security-First Nat. Bank* (1956) 146 Cal.App.2d 37, 43 [303 P.2d 565]; see *Notten* v. *Mensing* (1935) 3 Cal.2d 469, 477 [45 P.2d 198]; *Khoury* v. *Barham* (1948) 85 Cal. App.2d 202, 211 [192 P.2d 823]) the question whether the evidence is full, clear and convincing is primarily one for the trial court, and if there is substantial evidence to support its conclusion, the determination of the trial court is not open to review on appeal. (*Stromerson* v. *Averill* (1943) 22 Cal.2d 808, 815 [141 P.2d 732]; *Khoury* v. *Barham, supra,* 85 Cal. App.2d 202, 211; *Edwards* v. *Edwards* (1949) 90 Cal.App.2d 33, 40 [202 P.2d 589]; see *Viner* v. *Untrecht* (1945) 26 Cal.2d 261, 267 [158 P.2d 3]. See also 3 Witkin, Cal. Procedure (1954) § 84, pp. 2246-2247; Witkin, Cal. Evidence (1958) § 60, pp. 78-79.)

Accordingly, defendants' attempts to show in what particulars plaintiff did not meet his burden of proof must fail. Essentially these are arguments more properly directed to the trier of fact. Such claims not only ignore the above rules of review but also those set forth previously to the effect that the evidence must be viewed in the light most favorable to the respondent. (See *Peterson* v. *Grieger, Inc., supra,* 57 Cal. 2d 43, 51-52, and other authorities cited *supra*.)

Thus, at the outset, defendants argue that the 1935 transfer was made for a full and adequate consideration. In advancing this argument defendants point out that at the time of the transfer the unpaid balances of the encumbrances on the apartment house exceeded the value of the property; that as reflected by the affidavit and the profit-sharing agreement (see fns. 3 and 4, *ante*) plaintiff was exonerated from all liability for encumbrances totalling over $90,000; and that accordingly while Mrs. Marshall did not *receive,* she certainly *gave* adequate consideration for the transfer. The thrust of this argument is that there can therefore be no valid basis for a constructive trust since one of the requisites for its establishment in such a situation is that the grantee has paid *no* consideration for the transfer. In support of this proposition defendants cite *Cooney* v. *Glynn* (1910) 157 Cal. 583, 587 [108 P. 506]; *Brison* v. *Brison* (1888) 75 Cal. 525, 532 [17 P. 689, 7 Am.St.Rep. 189]; *Lyttle* v. *Fickling* (1945) 72 Cal.App.2d 383, 388 [164 P.2d 842]; *Resh* v. *Pillsbury* (1936) 12 Cal.App.2d 226, 231 [55 P.2d 264]; *Dalbkermeyer* v. *Rader* (1928) 96 Cal.App. 23, 28-29 [273 P. 600].

However this entire argument proceeds from the fundamental premise that the trial court adopted *defendants'* theory of case: that the 1935 transfer was an absolute one embracing plaintiff's full legal and equitable ownership and that in accordance with the arrangement fashioned by the pertinent documents the mother, being the actual owner in fact as well as in name, operated the property subject only to the first loan from the insurance company. As we have seen, the trial court's determination was just the opposite. The court, declining to draw inferences favorable to defendants, adopted *plaintiff's* theory of case: that in spite of the language of the 1935 documents, plaintiff transferred to his mother merely the bare legal title and not the equitable interest and, according to the *real* facts, plaintiff was the actual owner and his mother was operating the property as a trustee for him. Consistently with its adoption of plaintiff's theory of case, the court concluded that the net operating income of the Casa Bonita should be calculated for the period from July 9, 1935, to November 13, 1953, and that 66 per cent thereof should be applied to the payment of principal and interest on the first deed of trust obligation owing Prudential Insurance Company and 34 per cent thereof to the payment of principal and interest on the second deed of trust obligation owing Mrs. Marshall. The court thereby determined that

plaintiff was the actual owner of the property and as such was in effect chargeable with both obligations.[13] Behind the facade of the legal documents, the trial court perceived the outlines of the true agreement which the parties had made. In sum the court determined that the transfer was not an absolute one for a full and adequate consideration as claimed by defendants but one of the bare legal title only as a protective measure and as further security for advancements made by plaintiff's mother. It was because of such determination that the court declared the documents executed in 1935 and 1940 to be void and, as stated above, reallocated the net income in accordance with the true agreement of the parties.

As part of their attack on the sufficiency of the evidence, defendants also argue that the profit-sharing agreement is completely inconsistent with any trust arrangement. If the transfer were not absolute, say defendants, there would be no reason for having the profit-sharing agreement. If his mother was actually holding *all* the property for plaintiff, defendants ask, why should plaintiff agree to take only *one-half* of it in the event of a sale? If the real purpose of the transfer was to insulate the Casa Bonita from plaintiff's creditors, why would plaintiff frustrate this purpose and expose the property to creditors? As we have already pointed out, neither plaintiff nor his mother appeared to have recalled signing the profit-sharing agreement, much less why they did so. The substance of plaintiff's explanation was that Mr. Clark prepared the necessary documents to effectuate the purposes of the parties as claimed by plaintiff and that plaintiff must have signed the agreement merely because the attorney indicated to him that it was necessary to do so. The trial court was therefore warranted in believing that these were part of the "real facts" of the case (see *Brison* v. *Brison, supra,* 75 Cal. 525, 533) and that in view of this evidence, the written agreement, being the creature of the attorney,

---

[13]The court also concluded "That in the event the net income as defined in paragraph (a) for the period therein set forth shall be insufficient to liquidate the principal and interest of each of the deeds of trust, then so much of the principal as shall remain unpaid and so much of the interest as shall have accrued thereon, to and including November 13, 1953, shall become a lien upon the said Santa Barbara property in favor of the Estate of Emily V. Marshall, deceased, and there shall be added to such sum and to be a lien thereon the actual amount deposited in escrow by Emily V. Marshall to effect the exchange of Casa Bonita for the Santa Barbara property."

It will be recalled that in the judgment the court ordered that defendants were entitled to have a lien on the Santa Barbara property for reimbursements in the sum of $3,179.79.

did not derogate from the probity of the oral agreement upon which plaintiff rested his case, even though the two agreements appeared to be inconsistent. The resolution of these inconsistencies was part of the trial court's function. (*Berniker* v. *Berniker, supra,* 30 Cal.2d 439, 444.)

At oral argument defendants contended that the opinion in *Marshall* v. *Marshall, supra,* 165 Cal.App.2d 669, has imposed on plaintiff the burden of furnishing a reasonable explanation for the profit-sharing agreement. As already noted (see fn. 1, *ante*), the court on the first appeal reversed because it found no evidence to support an award of an undivided half interest in the property to each of the litigants. In rejecting plaintiff's argument that such an award could be supported by the profit-sharing agreement, the court observed that "*upon its face* that agreement negatives any trust in the property . . . [and] further, this agreement is one of the 1935 'documents' which the judgment expressly decrees to be void." (Italics added; p. 671.) Nowhere do we find language imposing upon plaintiff the requirement of furnishing a reasonable explanation for the profit-sharing agreement. The simple answer to defendants' objection concerning the agreement is that plaintiff *did* offer an explanation, as indicated above, and the trial court apparently concluded that however contradictory the agreement might be "upon its face," it could not prevail over the true facts of the situation as found by the court on substantial evidence.

The remaining arguments urged by defendants seek in effect to have us indulge in inferences contrary to those of the trial court from evidence which that court obviously chose to reject. Defendants urge that no reason existed for the transfer unless it were absolute, arguing that since plaintiff was a person of substantial wealth and had no creditors, it was absurd and beyond the power of reasonable minds to conclude that the transfer was made to protect the Casa Bonita from plaintiff's possible creditors. However, there is evidence that Mrs. Marshall suggested the transfer for this very reason and both mother and son had this purpose in effectuating the arrangements between them. It is urged that plaintiff and his mother dealt at arm's length in financial matters and that these facts strongly negate the parol agreement. They do not nullify the court's finding made on substantial evidence that there was a confidential relationship between mother and son during all of the period up to June 1954. The testimony of Mrs. Marshall herself amply supports

such finding and we observe no direct attack upon it in defendants' briefs. Indeed it is difficult to conceive how such an attack can validly be made. ▇ As Justice Peters wrote for this court in *Steinberger* v. *Steinberger* (1943) 60 Cal. App.2d 116, 122 [140 P.2d 31], "The basis of the confidential relationship exception is that under section 2224 of the Civil Code the equity courts will prevent one person who is in a confidential relation with another from becoming unjustly enriched by reason of a breach of the trust. It would seem, therefore, that a confidential relation in fact should be the test. Under such a test relief would be afforded in practically every case where there is a breach of the oral promise to reconvey. Few cases will arise where one person will convey property to another by absolute deed, and where the grantor will be satisfied with the oral promise of the grantee to reconvey, unless the grantor, in fact, has trust and confidence in the integrity and fidelity of the grantee. The result is that under such a test the exception tends to swallow up the rule to which it is supposed to be an exception. That is exactly what has happened in this state. ▇ The cases are clear that where there is some sort of a status between the grantor and the grantee, and confidence is imposed, a constructive trust will be imposed upon repudiation of the oral promise to reconvey. Thus actual trust and confidence, plus the relationship of parent and child, is sufficient [citations]. . . ."

▇ Defendants' assertions that the acts of the parties subsequent to the 1935 agreement are consistent only with the fact that an absolute transfer was intended, that plaintiff's testimony with respect to the 1935 transaction was "inherently weak, inconsistent and often false," that Mrs. Marshall gave full and adequate consideration for the 1940 quitclaim agreement and that the purpose thereof was to protect her, all seek to have us weigh the evidence and redetermine its conflicts, functions not within our province. (*Berniker* v. *Berniker, supra,* 30 Cal.2d 439, 444.)

Defendants next contend that the action is barred by the statute of limitations and by laches. ▇ Where, as here, an action is brought to impress a constructive trust on real property and to have plaintiff adjudged to be the owner thereof, such an action is in effect one for the recovery of real property within the meaning of Code of Civil Procedure section 318 and the applicable period of limitations is the five-year period prescribed by that section. (*Cohn* v. *Goodday* (1923) 191 Cal. 615, 625-626 [217 P. 756]; *Bradley Bros.* v.

*Bradley* (1912) 20 Cal.App. 1, 5-6 [127 P. 1044]; *Hillyer* v. *Hynes* (1917) 33 Cal.App. 506, 510 [165 P. 718].) ▌ In such an action to enforce an oral promise to reconvey property on the grounds of constructive fraud, the statute of limitations does not commence to run until the transferee repudiates the oral promise or dies. (See *Cohn* v. *Goodday, supra,* 191 Cal. 615, 627; *Cooney* v. *Glynn, supra,* 157 Cal. 583, 589; *Steinberger* v. *Steinberger, supra,* 60 Cal.App.2d 116, 124; *Svistunoff* v. *Svistunoff* (1949) 94 Cal.App.2d 651, 653 [211 P.2d 352]; *Atwood* v. *Elwood* (1955) 132 Cal.App.2d 761, 769 [283 P.2d 43].)

Defendants argue that in 1938 plaintiff demanded the Casa Bonita back from his mother and in 1948 told his mother's attorney, Mr. Clark, that the apartments were his property. As to the former incident, there is no evidence that Mrs. Marshall refused to return the property. There is evidence that about this time Mrs. Marshall became saddled with the burden of supporting plaintiff's sister and her family who had recently moved into the Casa Bonita and plaintiff was afraid that his mother "was going to turn my apartment house over to the others"; that in a discussion between the parties, the mother said "she still needed money" and the son decided he would "let her keep it" as he didn't need the money himself; and that the mother told him that she had made provision in case anything happened to her to return the apartment house to him. As to the 1948 incident with Mr. Clark, there is no evidence that Mrs. Marshall repudiated her agreement at that time. Defendants have not directed our attention to any evidence, including that pertinent to the above two incidents, which constrains us to conclude as a matter of law that Mrs. Marshall repudiated her promise to reconvey the property or asserted sole ownership of it, at any time prior to October 1953.

Defendants' alternative argument that the action is barred by laches also lacks merit. This contention is based largely on plaintiff's failure to demand a reconveyance after he returned from Nevada in 1936, his failure to take action after the above-mentioned 1938 incident which defendants characterize as a refusal by the mother to reconvey, his failure to do so after the 1948 incident, and his postponement of any action until his mother was 83 years of age and in a delicate and frail condition.

▌ As the court said in *Butler* v. *Holman* (1956) 146 Cal.App.2d 22, 28 [303 P.2d 573], cert. denied 353 U.S. 930

252

[77 S.Ct. 718, 1 L.Ed.2d 723], "Laches is an unreasonable delay in asserting a right which causes such prejudice to an adverse party as renders the granting of relief inequitable." [11] The question of laches is one for the determination of the trial court in the light of the facts and circumstances of the particular case and its conclusion thereon will not be set aside by an appellate court if there is substantial support for it in the evidence. (*Beckett* v. *Kaynar Mfg. Co., Inc.* (1958) 49 Cal.2d 695, 700 [321 P.2d 749]; in accord: *Austin* v. *Hallmark Oil Co.* (1943) 21 Cal.2d 718, 734 [134 P.2d 777]; *Hansen* v. *Bear Film Co., Inc.* (1946) 28 Cal.2d 154, 179 [168 P.2d 946]; *Butler* v. *Holman, supra.*) ▮ In an action to establish a constructive trust based on the violation of a parol promise continuing in nature, the doctrine of laches does not begin to operate until the trustee begins to act in hostility to such continuing obligation and such repudiation of the trust has been brought home to the beneficiary. (*Cooney* v. *Glynn, supra,* 157 Cal. 583, 589; *Airola* v. *Gorham* (1942) 56 Cal.App.2d 42, 54 [133 P.2d 78] and cases there cited; *Forman* v. *Goldberg* (1941) 42 Cal.App.2d 308, 316 [108 P.2d 983].)

▮ In the instant case there is no evidence that Mrs. Marshall acted in hostility to her continuing obligation to return the Casa Bonita to plaintiff until October 1953 when she traded the apartments for the Santa Barbara property, nor is there any evidence that this wrongful act was brought home to plaintiff prior to May 1954. The present action was filed in November 1954. The court was therefore warranted in concluding that the action was not barred either by laches or the statute of limitations.

Defendants further contend that the trial court erred in failing to dismiss the action since the record establishes that, as a matter of law, plaintiff was guilty of unclean hands. The point of the argument is that according to plaintiff's theory the transactions were entered into in 1935 and 1940 to protect the Casa Bonita against possible claims of creditors thus disclosing an intent on plaintiff's part to defraud his creditors.

This issue was not raised by the pleadings or by the pretrial statements. Defendants' written objections to plaintiff's proposed findings of fact and conclusions of law contain no request for a special finding on the subject of plaintiff's unclean hands. (Code Civ. Proc., § 634.) The record nowhere discloses that defendants raised the issue during trial. It does

disclose that it was raised upon the hearing of the motion for new trial. In their supplemental points and authorities submitted to us, defendants also assert that the issue was specifically raised in their brief submitted to the trial court in lieu of oral argument and presumably after the taking of evidence had been concluded.

The doctrine of unclean hands must be raised in the trial court to be available as a defense. (*Watson* v. *Poore* (1941) 18 Cal.2d 302, 311-312 [115 P.2d 478]; *Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 726 [39 Cal.Rptr. 64]; *Palmer* v. *Financial Indem. Co.* (1963) 215 Cal.App.2d 419, 436 [30 Cal.Rptr. 204]; *Moriarty* v. *Carlson* (1960) 184 Cal. App.2d 51, 57-58 [7 Cal.Rptr. 282]; *Sears, Roebuck & Co.* v. *Blade* (1956) 139 Cal.App.2d 580, 594 [294 P.2d 140]; *Stone* v. *Lobsien* (1952) 112 Cal.App.2d 750, 758 [247 P.2d 357]; *Solomon* v. *Walton* (1952) 109 Cal.App.2d 381, 386 [241 P.2d 49]; *Scannell* v. *Murphy* (1947) 82 Cal.App.2d 844, 849 [187 P.2d 790].) As we said in *Fibreboard* "it must be pleaded or called to the attention of the trial court in order that it may pass on the defense and also to permit the person against whom it is sought to be applied the opportunity to present such evidence as might bear on that issue." (227 Cal.App.2d at p. 726.) In *Stone* v. *Lobsien, supra,* the defense was not pleaded or made an issue at trial but, as in the instant case, was raised by appellant in a closing brief in the trial court and was argued on the motion for new trial. This court said that "It was within the discretion of the trial court to refuse to consider the issue at that late date." (112 Cal.App.2d at p. 758.) We are of the same view now and therefore hold that the defense has not been properly raised.

We turn to defendants' contentions that the court committed prejudicial error in making certain rulings on the evidence. Three instances are cited:

First, it is claimed that the court erred in admitting into evidence, over defendants' objection, a 26-page letter written by plaintiff to his Aunt Edith (his mother's sister) a copy of which plaintiff sent to his mother. The letter, dated June 7, 1954, is a summary from plaintiff's point of view of the various events and transactions pertaining to the Casa Bonita and of the activities of Mrs. Marshall, her attorney and other persons in connection with the property. It is obviously replete with self-serving statements.

When, at the beginning of the trial and before the first witness was called, the above letter was offered, defendants objected on the grounds that "it is pure hearsay, it is self-serving, it is a statement made by plaintiff for his own benefit." The court overruled the objection, observing "that it is a statement of contentions made when a matter is in dispute and it may have some relevancy on her failure to deny." However the record shows that the court subsequently clarified the purpose for which the letter was received. During the cross-examination of plaintiff, defendants' counsel engaged in a long and incisive interrogation directed to various portions of the letter in the course of which the court observed that "I received it [the letter] for the *limited purpose* of showing that the mother received the letter." (Italics added.) The record at this point discloses no objection by defendants' counsel to the court's remarks. Statements written or oral received in evidence not as proof of, but without reference to, the truth of the matter asserted are not within the hearsay rule. (6 Wigmore on Evidence (3d ed.) § 1766, pp. 177-178; Witkin, Cal. Evidence (1958) § 205, p. 232; McCormick on Evidence, § 225, p. 460; *First Western Bank & Trust Co.* v. *Omizzolo* (1959) 176 Cal.App.2d 555, 563 [1 Cal.Rptr. 758]; *People* v. *Radley* (1945) 68 Cal.App.2d 607, 609 [157 P.2d 426].)

Secondly, it is claimed that the court erred in restricting the cross-examination of plaintiff with respect to the "Aunt Edith" letter. This claim proceeds on the erroneous assumption that the letter was received as evidence of the truth of the matters stated therein. As we have just explained, it was not. Hence defendants' argument that the introduction of the letter by plaintiff "certainly made the statements in the letter analogous to testimony on his part" is misconceived. The record discloses that the trial court permitted defendants' counsel to use the letter for the purpose of impeaching plaintiff in respect to his *testimony* given at the trial but not for the purpose of impeaching his veracity in respect to *statements made in the letter* not testified to and not relevant to the issues at the trial.

 It is well settled that the scope of cross-examination rests largely within the sound discretion of the trial court (*People* v. *Morlock* (1956) 46 Cal.2d 141, 149 [292 P.2d 897]; *Grimbley* v. *Harrold* (1899) 125 Cal. 24, 32 [57 P. 558, 73 Am.St.Rep. 19]) and its rulings thereon will not be disturbed on appeal in the absence of a clear showing of abuse of dis-

cretion. (*Garcia* v. *Hoffman* (1963) 212 Cal.App.2d 530, 536 [28 Cal.Rptr. 98].) ██ ''It is well established that the scope of proper cross-examination may extend to the whole transaction of which the witness has *testified,* or it may be employed to elicit any matter which may tend to overcome, qualify or explain the *testimony* given by a witness on his direct examination. [Citations.]'' (Italics added; *People* v. *Dotson* (1956) 46 Cal.2d 891, 898 [299 P.2d 875]; *People* v. *Swayze* (1963) 220 Cal.App.2d 476, 496-497 [34 Cal.Rptr. 5].)

██ However the right of cross-examination is not unlimited and is subject to reasonable control by the trial judge. (*People* ex rel. *Dept. of Public Works* v. *Lillard* (1963) 219 Cal.App.2d 368, 378 [33 Cal.Rptr. 189].) ██ It is the duty of the trial judge to restrict the cross-examination to reasonable limitations. (*People* v. *Chapman* (1962) 207 Cal. App.2d 557, 577 [24 Cal.Rptr. 568]; *People* v. *Barragan* (1958) 163 Cal.App.2d 625, 629 [329 P.2d 733]; *People* v. *Hambrick* (1958) 162 Cal.App.2d 239, 244 [327 P.2d 570].)

██ Generally speaking, the rule in California is that the scope of cross-examination is limited to matters concerning which the witness testified on direct examination. (Code Civ. Proc., § 2048; *People* v. *Watson* (1956) 46 Cal.2d 818, 826 [299 P.2d 243], cert. denied 355 U.S. 846 [78 S.Ct. 70, 2 L.Ed.2d 55]; *People* v. *Biehler* (1963) 215 Cal.App.2d 400, 404 [30 Cal.Rptr. 199].) ██ As was said in *People* v. *Grayson* (1959) 172 Cal.App.2d 372, 376 [341 P.2d 820], ''A witness may not be cross-examined on matters which are irrelevant or outside the scope of direct examination for the purpose of testing the witness' credibility, nor may unrelated matters be brought out for the purpose of showing that the witness on other occasions made contradictory statements. [Citations.]'' (See also *Garcia* v. *Hoffman, supra,* 212 Cal. App.2d 530, 536-537.)

██ In the instant case, the cross-examination of plaintiff on various portions of the Aunt Edith letter was protracted and in detail, extending over approximately 75 pages of the reporter's transcript. Defense counsel was not prevented from cross-examining on matters to which plaintiff had testified on direct examination. Defendants have not claimed that any statements in the letter sought to be brought in on cross-examination but excluded by the court would have contradicted *testimony* given by plaintiff on direct examination. Under the circumstances we cannot say that the trial judge abused his discretion.

 Thirdly, it is claimed that the trial court erred in permitting plaintiff to testify, over objection, as to statements made by attorney George Clark in respect to the 1940 quitclaim agreement. Plaintiff testified on direct examination that shortly before he took over the Castlewood Country Club he had conversations with Mr. Clark at the latter's office about the Casa Bonita. He was then asked what the attorney said to him about the quitclaim agreement to which defendants objected upon the ground that Mrs. Marshall was not bound by the attorney's oral statements, that she had not authorized the latter to commit his client concerning his interpretation of a document "which may have been entirely different" from hers, and that any representations of the attorney unless authorized or ratified by Mrs. Marshall were totally inadmissible. During the course of these objections, plaintiff's counsel invited the court's attention to the deposition of Mr. Clark already in evidence (also see fn. 10, *ante*) in which the attorney testified that he drew the 1940 quitclaim agreement and that at the time he drew it he was Mrs. Marshall's attorney. Defendants' objections were overruled and, as we have already set forth, plaintiff testified that Mr. Clark stated that the purpose of the agreement was to insulate plaintiff against creditors.[14]

Defendants contend on this appeal that it was error to admit the evidence because "There was not one shred of evidence that Mrs. Marshall authorized George Clark to waive any provision of the quitclaim or change it in any way." But that is not the question before us. The crucial issue is whether, according to the true facts and in spite of recitals of the quitclaim, plaintiff and his mother continued with their arrangement under which she held only the bare legal title of the property.[15] The trial court could reasonably infer that Mr. Clark was acting as the mother's agent in the preparation of the quitclaim which all parties agree was made necessary

---

[14]In pertinent part plaintiff testified: "Mr. Clark said that for my own protection, that I would have to sign that agreement for the reason he was sure, he was certain that Castlewood was going to fail. He said the biggest brains in the East Bay tried to operate the place, and they never succeeded, and there is no reason to think I can. . . . He said this was to insulate me against creditors when they came, and he was certain they were going to come. . . . Q. [By plaintiff's counsel.] After those conversations, did you then in fact sign the agreement of April 16th, 1940? A. Yes."

[15]It will be recalled that the court found that "The reasons for the execution of this document were essentially the same as those obtaining when the earlier ones were executed."

by plaintiff's entry into the Castlewood venture and that the statements ascribed to Mr. Clark were made by him in the discharge of his duties in preparing the document and obtaining plaintiff's signature to it. Basically the central question is one of agency. The record discloses that the agency of Clark was proved by independent evidence.[16]

After proof of agency, the relevant admissions of an agent made within the scope and course of the agency, during its existence and in connection with the discharge of his duties are admissible in evidence against the principal. (Code Civ. Proc., § 1870, subd. 5; 4 Wigmore on Evidence (3d ed.) § 1078; Witkin, Cal. Evidence (1958) § 230, pp. 259-260; McCormick on Evidence, § 244, pp. 517-520; Rest. 2d Agency, § 286; *Garfield* v. *Knight's Ferry Water Co.* (1859) 14 Cal. 35, 37; *Hubback* v. *Ross* (1892) 96 Cal. 426, 430 [31 P. 353]; *Dore* v. *Southern Pac. Co.* (1912) 163 Cal. 182, 196-197 [124 P. 817]; *Handley* v. *Guasco* (1958) 165 Cal.App.2d 703, 708 [332 P.2d 354]; *Miller* v. *Anson-Smith Constr. Co.* (1960) 185 Cal.App.2d 161, 165-166 [8 Cal.Rptr. 131]; 19 Cal.Jur.2d, Evidence, § 433, pp. 184-187; 31A C.J.S., Evidence, § 343, pp. 834-840; 20 Am.Jur., Evidence, § 596, pp. 505-508.)

We find no error in any of the rulings objected to. Finally, defendants contend that the judgment should be reversed because the court failed to require plaintiff to do equity as a condition precedent to his right to relief. Specifically they complain of the court's failure to give Mrs. Marshall credit for expenses in conducting the trust such as income taxes paid, attorneys' fees for drawing the transfer documents and the value of her services in managing the trust property. As previously stated the court provided for the recalculation of the Casa Bonita income, for the allowance as a credit against income of all reasonable and necessary operating expenses and for the payment of principal and interest on both loans. The judgment allowed defendants a lien in the amount by which the net income was insufficient to liquidate both loans. This equitable adjustment of the relationship of the litigants consistent with the court's establishment of a constructive trust is not under attack.

---

[16]As previously noted, there was testimony by Mr. Clark relative to an incident in 1948 in connection with which he stated that he had been Mrs. Marshall's attorney "in all matters connected with Casa Bonita Apartments." This testimony given at the first trial was received in evidence at the third trial, after Mr. Clark's death.

 However defendants' present claim for additional credits for expenses is in essence an attempt to assert rights conferred on trustees by Civil Code sections 2273 and 2274.[17] These rights are denied by law to involuntary trustees who become such by wrongful conduct on their part. (Civ. Code, § 2275.)[18] In the instant case such conduct consisted of the violation of the trust by plaintiff's mother.

It is also to be noted that neither Mrs. Marshall nor her representatives made any claim at trial for compensation for her services as trustee. Indeed her position was just the opposite—that she was not a trustee but the absolute owner of the property.[19] Where, as here, a trustee has denied the existence of the trust relationship and has not pleaded that he has made any advancements on account of the trust property, where the trustee's right to reimbursement for expenses or services was not an issue in the case and where his evidence as to expenditures or services was introduced solely in furtherance of his claim of absolute ownership of the property, he may not on appeal seek reimbursement for

---

[17]Section 2273 provides: ''A trustee is entitled to the repayment, out of the trust property, of all expenses actually and properly incurred by him in the performance of his trust. He is entitled to the repayment of even unlawful expenditures if they were productive of actual benefit to the estate.''

Section 2274 provides: ''Except as provided in section 1122 of the Probate Code, when a declaration of trust is silent upon the subject of compensation the trustee is entitled to the same compensation as an executor. If it specifies the amount of his compensation, he is entitled to the amount thus specified and no more. If it directs that he shall be allowed a compensation, but does not specify the rate or amount, he is entitled to such compensation as may be reasonable under the circumstances. If there are two or more trustees the compensation shall be apportioned among the trustees according to the services rendered by them respectively.''

[18]Section 2275 provides: ''An involuntary trustee, who becomes such through his own fault, has none of the rights mentioned in this article.''

[19]We find nothing in the pleadings, pretrial conference order or pretrial statements warranting the conclusion that Mrs. Marshall or her representatives claimed a right of reimbursement. Such a claim does not appear as one of the issues. Issues not designated in the pretrial conference order are no longer issues in the case. (*City of Los Angeles* v. *County of Mono* (1959) 51 Cal.2d 843, 847 [337 P.2d 465]; *Feykert* v. *Hardy* (1963) 213 Cal.App.2d 67, 74 [28 Cal.Rptr. 510]; *County of Kings* v. *Scott* (1961) 190 Cal.App.2d 218, 225 [11 Cal.Rptr. 893]; *Baird* v. *Hodson* (1958) 161 Cal.App.2d 687, 690-691 [327 P.2d 215].) Evidence relevant to the mother's expenses, income taxes and similar items was not introduced in support of a claim for reimbursement but in support of defendants' theory of case that the mother was the absolute legal and equitable owner of the property. There is some reference to the mother's claim for compensation in connection with defendants' motion for a new trial.

such expenditures and services on a different theory. (*Berniker* v. *Berniker, supra,* 30 Cal.2d 439, 449-450, 452; *Islas* v. *Islas* (1963) 213 Cal.App.2d 412, 418 [28 Cal.Rptr. 850].)

Nor did the trial court abuse its discretion in declining to recognize on defendants' motion for new trial such a claim which was entirely inconsistent with defendants' position at trial. *District Bond Co.* v. *Pollack* (1942) 19 Cal.2d 304 [121 P.2d 7] and *Dool* v. *First National Bank* (1929) 207 Cal. 347 [278 P. 233], cited by defendants, are not in point. *Ochoa* v. *McCush* (1931) 213 Cal. 426 [2 P.2d 357], also relied upon by them, is distinguishable since there the party awarded reimbursement was found by the court to have acted in good faith and to be entitled under the particular circumstances of that case to reimbursement.

The judgment is affirmed.

Molinari, J., and Sims, J., concurred.

A petition for a rehearing was denied March 10, 1965, and appellants' petition for a hearing by the Supreme Court was denied April 14, 1965.