Filed 7/12/23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CITY OF HESPERIA,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>LAKE ARROWHEAD COMMUNITY SERVICES DISTRICT et al.,<br><br>    Defendants and Respondents;<br><br>SUNPOWER CORPORATION SYSTEM,<br><br>    Real Party in Interest and Respondent. | D079956<br><br>(Super. Ct. No. CIVDS2019176) |

APPEAL from a judgment of the Superior Court of San Bernardino County, David S. Cohn, Judge.  Affirmed.

Aleshire & Wynder, Eric L. Dunn, June S. Ailin, and Nicholas P. Dwyer for Plaintiff and Appellant.

Best Best & Krieger, Amy E. Hoyt and Amanda Daams; Stoel Rives and Lindsay D. Puckett for Defendants and Respondents Lake Arrowhead

Community Services District and Board of Directors of Lake Arrowhead Community Services District.

Allen Matkins Leck Gamble Mallory & Natsis and Emily L. Murray for Real Party in Interest and Respondent, SunPower Corporation System.

I.

INTRODUCTION

This appeal arises from a second lawsuit brought by the City of Hesperia (the City) against respondents Lake Arrowhead Community Services District and the Board of Directors of Lake Arrowhead Community Services District (jointly, the District) regarding a proposed 0.96-megawatt solar photovoltaic project (the Solar Project) that the District has been planning to develop on six acres of a 350-acre property it owns that is known as the Hesperia Farms Property.[1] The Hesperia Farms Property is located within the City's municipal boundary and is generally subject to the City's zoning regulations.

The District began considering the development of the Solar Project with an eye toward the use of a state renewable energy self-generation bill credit transfer program (the RES-BCT program), as codified in Public Utilities Code[2] section 2830. The RES-BCT program permits local governmental entities to offset the cost of their energy consumption at one

---

[1] The first lawsuit filed by the City against the District regarding the Solar Project was *City of Hesperia v. Lake Arrowhead Community Services District et al.*, San Bernardino County Superior Court case No. CIVDS1602017, filed in February 2016 (the 2016 lawsuit).

[2] Further statutory references are to the Public Utilities Code unless otherwise indicated.

location by receiving bill credits for the generation of renewable energy at a different location.  (See § 2830, subs. (a)(1), (a)(2), (a)(4) & (c).)

In August 2015, in anticipation of its use of the bill crediting system provided for under the RES-BCT program, the District entered into a Public Utilities Commission Rule 21 Generator Interconnection Agreement for Exporting Facilities (the Interconnection Agreement) with Southern California Edison (SCE), the investor-owned utility company that provides energy service to all of the District's facilities.  The Interconnection Agreement authorizes the Solar Project's connection to SCE's electrical grid distribution system and provides that the District will receive a credit for its generation of electrical energy at the RES-BCT tariff rate that it may use to offset the cost of energy it consumes at other sites.

The District first approved its Solar Project in December 2015, after determining that the project was either absolutely exempt from the City's zoning regulations under Government Code section 53091, or qualifiedly exempt under Government Code section 53096.[3]  Displeased with the District's determination that it was not required to comply with the City's zoning regulations, the City filed an action against the District seeking a writ of mandate prohibiting the District from further pursuing the Solar Project. The City challenged the District's approval of the Solar Project on two

---

[3]     Government Code section 53091, subdivision (e) provides an absolute exemption from local zoning regulations for "the location or construction of facilities . . . for the production or generation of electrical energy"—unless those facilities are "for the storage or transmission of electrical energy," in which event the local zoning ordinances apply.  Government Code section 53096, subdivision (a) provides a qualified exemption for an agency's proposed use upon a showing that (a) the development is for facilities "related to storage or transmission of water or electrical energy" and (b) four-fifths of the agency's members "determine[ ] by resolution" that "there is no feasible alternative to [the agency's] proposal."

grounds: (1) that the District was without statutory authority to construct and operate the Solar Project, and (2) that the Solar Project was not exempt from the zoning regulations under either of the Government Code provisions on which the District had relied. At the conclusion of the trial court proceedings, the court determined that the District possessed the authority to develop and operate the Solar Project but agreed with the City that the District was not exempt from the City's zoning regulations under either Government Code section 53091 or Government Code section 53096. While the District appealed the trial court's judgment, the City did not cross-appeal to challenge that portion of the trial court's ruling that the District possessed the authority to construct and operate the Solar Project.

This court affirmed the trial court's judgment in *City of Hesperia v. Lake Arrowhead Community Services Dist.* (2019) 37 Cal.App.5th 734 (*Hesperia I*). In *Hesperia I,* we determined that the District's Solar Project was not exempt from the City's zoning regulations under Government Code section 53091's absolute exemption, or under Government Code section 53096's qualified exemption. (*Hesperia I, supra,* at pp. 758–759, 760–765.) We concluded, however, that Government Code section 52096's qualified exemption did not apply to the District's approval of the Solar Project only because the District had failed to provide substantial evidence to support its conclusion that there was no other feasible alternative to its proposed location for the Solar Project. This result left open the possibility that the District could undertake further analyses and show that there is no feasible alternative to the Solar Project's proposed location—this time with substantial supporting evidence in the record—in order to avoid application of the City's zoning ordinances.

4

In response to *Hesperia I*, the District began a process to address the evidentiary failures in the administrative record in connection with its no-feasible-alternative determination. The District retained experts to conduct technical analyses and develop reports evaluating the feasibility of other potential sites for developing a solar energy facility, and District staff prepared a feasibility study. In June 2020, after these reports and studies had been completed, the District's board members unanimously adopted a resolution concluding that there is no feasible alternative to the Hesperia Farms Property location for developing a solar energy facility.[4]

A few months after the District made its second no-feasible-alternative determination with respect to the Solar Project, the City filed a second petition for writ of mandate and complaint challenging the Solar Project. In this second action, the City asserts four causes of action against the District. In the first cause of action, the City challenges the District's eligibility to use the RES-BCT program with respect to the Solar Project as proposed on the Hesperia Farms Property; specifically, the City alleges that the Hesperia Farms Property is not within the District's "geographical boundaries" as required by section 2830. In the second cause of action, the City alleges violations of the California Environmental Quality Act (CEQA). And in the third case of action, the City challenges the sufficiency of the evidence to support the District's no-feasible-alternative determination under Government Code section 53096's zoning exemption. In a fourth cause of

---

[4] However, at this point in time, the District's members approved an alternate site for the Solar Project on the Hesperia Farms Property, in that the proposed project is now to be located 660 feet north of the southern property line, rather than at the southern property line. This slight adjustment to where the Solar Project would be placed on the Hesperia Farms Property was done so that the Solar Project could comply with one particular aspect of the City's zoning ordinance.

action, the City seeks declaratory relief predicated on the first and third causes of action.

After full briefing and argument from the parties, the trial court ultimately denied the City's petition for a writ of mandate. The court rejected the City's CEQA challenge and concluded that the administrative record contains substantial evidence to support the District's no-feasible-alternative determination. The court also determined that the City's challenge to the Solar Project's eligibility under the RES-BCT program was barred by the doctrine of laches. The court entered judgment in favor of the District.

The City now appeals from that judgment. On appeal, the City argues that the trial court erred in concluding that its challenge to the Solar Project's eligibility under the RES-BCT program was barred by laches. The City further argues that if this court concludes that the trial court's laches ruling was erroneous, we should also conclude that the Solar Project, as conceived of and approved by the District, fails to meet the requirements of the RES-BCT program because the proposed solar farm would not be "within the geographical boundary" of the District, as required by the language of section 2830. The City also argues that because the Solar Project does not meet the "geographical boundary" requirement of the RES-BCT program, the District's determination that other potential locations were not feasible was not supported by substantial evidence because the District relied in part on the fact that many of those alternative locations would not be eligible for RES-BCT program in rejecting those alternatives. The City contends that the Hesperia Farms Property *also* should not have been considered to be an

6

eligible location for an energy generation facility under the RES-BCT program in the District's no-feasible-alternative analysis.[5]

In response to the City's appeal, the District urges this court to affirm the trial court's laches ruling while also providing a number of alternative grounds to support affirming the trial court's determination that the City is unable to prevail on its first cause of action. The District also responds that even if this court concludes that the trial court's laches ruling is unsupported *and* if this court rejects all of the District's alternative procedural grounds for affirming the trial court's determination with respect to the first cause of action, the trial court's determination should still nevertheless be affirmed on the ground that the Solar Project, as proposed on the Hesperia Farms Property, fulfills the requirements of the RES-BCT program, including the requirement that the energy producing facility be located "within the geographical boundaries" of the District. The District also contends that its determination that there are no feasible alternatives to the Solar Project as envisioned at the Hesperia Farms Property is supported by substantial evidence in the administrative record.

We conclude that the trial court did not err in rejecting the City's petition for writ of mandate. We therefore affirm the judgment.

---

[5]     We note that by narrowing its appeal to the issues that we identify in the text, the City has conceded the correctness of the trial court's ruling with respect to the City's second cause of action, in which the City asserts a claim under CEQA, as well as that aspect of the fourth cause of action for declaratory relief in which the City seeks a declaration regarding the CEQA claim.

## BACKGROUND

A.    *Background regarding the District and the Hesperia Farms Property*

Established in 1978 under the Community Services District Law (Gov. Code, § 61000 et seq.), the District provides water and wastewater services to customers within the unincorporated community surrounding Lake Arrowhead.[6]  The topography of the Lake Arrowhead area requires the pumping of water, wastewater, and recycled water over significant elevation changes.  The District operates and maintains 40 pump stations and requires the recharging of over 1,000-acre feet of treated water at a percolation facility that the District operates at the Hesperia Farms Property.  As a result, the District's operations are energy intensive; on a per-water-unit basis, the District is one of the highest energy users in the nation.

The 350-acre Hesperia Farms Property is located approximately eight miles north-northwest of Lake Arrowhead.  The Hesperia Farms Property consists of 10 adjacent parcels; eight of the parcels are located within the southeastern portion of the City, and two are located just outside the City's boundary.  The District has owned the property since the 1970's; for decades, the District has pumped treated effluent from its wastewater treatment facilities to the Hesperia Effluent Management Site facility located at the Hesperia Farms Property.  The treated wastewater is conveyed through the District's 10-mile outfall pipeline to four percolation ponds on the Hesperia Farms Property, through which it is reintroduced into the Mojave River groundwater basin.

---

[6]    The District serves approximately 8,000 water customers and 10,500 wastewater customers.  The District's boundary for its provision of water service differs from its boundary for its provision of wastewater service.

Since 2010, the Local Agency Formation Commission for San Bernardino County—the entity tasked with establishing and authorizing special districts like the District—expanded the District's "sphere of influence" to include the Hesperia Farms Property.[7]  However, the Hesperia Farms Property is not located within either the District's water service area or its wastewater service area.

---

[7]    "Sphere of influence" is a term defined in the Cortese–Knox–Hertzberg Local Government Reorganization Act of 2000 (the Local Government Reorganization Act) as follows:  " 'Sphere of influence' means a plan for the probable physical boundaries and service area of a local agency, as determined by the [local agency formation] commission."  (Gov. Code, § 56076.)  The Local Government Reorganization Act was enacted to encourage orderly growth and development in California, and the Reorganization Act identifies an "important factor" in achieving the policy goal of orderly growth and the efficient extension of government services as "the logical formation and determination of local agency boundaries."  (Gov. Code, § 56001.)  A " '[l]ocal agency' " includes a city, a county, and a district/special district.  (Gov. Code, §§ 56054, 56036.)  The Local Government Reorganization Act provides for the establishment of a local agency formation commission in each county, which is the administrative agency charged with the responsibility of determining the boundaries of cities and districts.  (*City of Patterson v. Turlock Irrigation Dist.* (2014) 227 Cal.App.4th 484, 492 (*City of Patterson*), citing Gov. Code, §§ 56325-56337, 56375, 56301.)  A local agency formation commission's authority over the boundaries of local agencies includes the power to approve a change in the boundaries of an existing district (*City of Patterson*, at p. 492, citing Gov. Code, § 56375, subd. (a)(1) [power to approve or disapprove proposals for changes of organization]; § 56021, subd. (c) [" 'Change of organization' " includes annexation to city or district]), as well as the power to "develop and determine the sphere of influence of each city and each special district, as defined by Section 56036, within the county and enact policies designed to promote the logical and orderly development of areas within the sphere."  (Gov. Code, § 56425.)

B.      *The origination, initial planning, and approval of the proposed Solar Project*

In response to Congressional authorization provided in 2007 and 2010, the United States Bureau of Reclamation conducted a study to evaluate potential water, wastewater, and alternative energy solutions to meet the District's increasing needs. The Bureau of Reclamation's study concluded that the expected demand for water would increase and exceed the District's available water supply sources by 2030, and that there would be a corresponding increase in the District's energy needs to deal with the projected increase in water and wastewater demands. The report included discussion of a SunPower Corporation evaluation of the Hesperia Farms Property that indicated that the site had a "high potential for a solar installation." The report further suggested that "[a]ssuming [SunPower's] calculations are correct and valid, a full evaluation of the site's potential solar development should be conducted."

During 2014 and 2015, in response to this report, the District considered design and financing options for developing a solar project for the purpose of offsetting the energy costs associated with its operations and facilities. For example, in January 2014, the District received an analysis from an outside engineering consultant regarding the potential development of solar power at its Hesperia Farms Property. (*Hesperia I, supra,* 37 Cal.App.5th at p. 742.) Then, in June 2014, the District created a solar power alternatives ad hoc committee, which eventually considered presentations from three solar power vendors for a potential solar project. (*Ibid.*)

The District ultimately settled on an option for installing a .96 megawatt solar project on approximately six of the 350 acres that comprise the Hesperia Farms Property—i.e., the Solar Project. The District determined that utilization of section 2830's RES-BCT Program would

10

provide for the most beneficial use of a solar project developed on the Hesperia Farms Property, given that the purpose of the program is to allow a local government such as the District to utilize raw or minimally developed land to generate energy from alternative sources such as solar or wind, and then use credits from the generation of energy on that land, which typically does not have a significant energy burden, to offset the energy costs of local government facilities elsewhere that have a greater energy burden.

In November 2014, District staff began to meet with members of the City's planning department and the City's manager to discuss the permitting process that would be required of the District to develop the Solar Project on the Hesperia Farms Property. At that time, City staff indicated a concern to the District that the Hesperia City Council would be disinclined to approve a permit for a solar project at that location, given that the City Council had repeatedly denied other proposed solar projects.[8] The District nevertheless undertook the environmental review process under the CEQA (Pub. Res. Code, § 21000 et seq.) for the Solar Project.

On May 20, 2015, during the CEQA review process, the City sent a comment letter to the District regarding a proposed initial study and mitigated negative declaration for the Solar Project. In that letter, the City requested, among other things, that the District request from the City a "general plan amendment and zone change," and also that the District relocate the Solar Project 660 feet to the north in order for the project to comply with a City ordinance requiring that solar systems be located at least

---

[8]     As of 2018, the District had been unable to identify a single "ground-based solar farm" that had been approved by the City and constructed to completion.

11

660 feet from agriculturally designated property.[9]  Although the City also raised other minor issues in its May 20, 2015 letter, it did not raise any question as to the eligibility of the Hesperia Farms Property for generating alternative energy for use as a credit toward energy use at other District facilities under the RES-BCT program.

At a publicly noticed meeting in August 2015, the District voted to authorize its general manager to execute a generator interconnection agreement with SCE under the RES-BCT program for the Solar Project.  The City voiced no opposition to the District's authorization of an interconnection agreement with SCE in connection with the planned Solar Project.  That same month, the District entered into the Interconnection Agreement with SCE, which authorized an anticipated solar project at the Hesperia Farms Property to be connected to SCE's electrical grid distribution system; pursuant to this agreement, the District would be able to credit its energy generation from a Hesperia Farms Property solar facility toward its consumption of energy at other District facilities.

---

[9]     As was relevant to the City's requested changes to the District's proposed Solar Project, the Hesperia Municipal Code section 16.16.063.B sets forth a limitation with respect to the siting of solar farms, providing in relevant part:  " 'Solar farms shall only be allowed on nonresidential and nonagricultural designated properties with approval of a conditional use permit by the planning commission.  Solar farms shall not be permitted within six hundred sixty (660) feet of a railway spur, any interstate, highway, or major arterial, arterial, or secondary arterial roadway; *or any agricultural* or residentially *designated property*.' " (*Hesperia I*, *supra*, 37 Cal.App.5th at p. 742, italics added.)  The proposed Solar Project was to be located on a parcel that was zoned as "Rural Residential" and designated as "Rural Residential 0-0.4 units per acre" under the City's general plan. (*Id*. at p. 741.)  In addition, according to the City, the District's proposed siting of the Solar Project was within 660 feet of an agriculturally-designated property to the south. (*Id*. at p. 742.)

After considering the comments from the City and others in response to the proposed initial study and mitigated negative declaration for the Solar Project, the District gave notice of " 'a public hearing at which the Board may make findings pursuant to Section 53096 of the Government Code that there is no feasible alternative to the proposed location of the solar project at the Hesperia Farm Solar Photovoltaic Project Site and that, by four-fifths vote of the Board, the City of Hesperia's zoning ordinance is, therefore, rendered inapplicable.' " (*Hesperia I*, *supra*, 37 Cal.App.5th at p. 743.)  In response to this notice of potential action by the District, on December 14, 2015, the City repeated its original objections to the Solar Project as outlined in its May 2015 letter—i.e., that the Solar Project required an amendment to the City's general plan and a change in location to avoid a violation of Hesperia Municipal Code section 16.16.063.B.  (*Ibid*.)  The City also expressed its opposition to the District's proposed actions that might allow the District to avoid application of the City's local land use regulations.  (*Ibid*.)  The City did not question the eligibility of the Hesperia Farms Property for use under the RES-BCT program.

On December 15, 2015, the District adopted the initial study and mitigated negative declaration (Final MND) and approved the Solar Project for the originally-planned site—i.e., a location on the Hesperia Farms Property that was within 660 feet of the neighboring parcel designated for agricultural use (the Original Location).  The publicly circulated Final MND, the staff report for the District's board of directors agenda item related to the Solar Project approval, and the District's resolution adopting the Final MND all indicated that the Solar Project was being developed to generate alternative energy units for the purpose of obtaining credits to offset the District's consumption at other sites.

13

In connection with its adoption of the Final MND and approval of the Solar Project at the Original Location, the District adopted resolution No. 2015-14, in order to render the City's zoning ordinances inapplicable to the District's Solar Project. In adopting this resolution, the District determined that the Solar Project was absolutely exempt from local zoning ordinances under Government Code section 53091 because it was a facility for "the production or generation of electrical energy." The District also determined, in the alternative, that the Solar Project was exempt from local zoning ordinances under Government Code section 53096 because there was no feasible alternative to the Solar Project as proposed. Resolution No. 2015-14 also included the following language: "SunPower will . . . arrange with the local utility for interconnection of the facilities to generate energy that will be used by the local utility and result in credits to offset use by the District at its operating facilities under the RES[-]BCT Tariff."

C.     *The prior litigation and appeal*

In response to the District's December 15, 2015 resolution approving the Project and determining that the Solar Project was exempt from the City's zoning regulations, the City initiated the 2016 lawsuit by filing a petition and complaint seeking a writ of mandate and declaratory and injunctive relief. In the 2016 lawsuit, the City asserted three causes of action. In the first cause of action, the City alleged that the District lacked the authority to construct and operate a solar facility under the California Community Services District Law (CSDL; Gov. Code, § 61000 et seq.) and the

14

Cortese-Knox-Hertzberg Act (Gov. Code, § 56000 et seq.).[10] In the second cause of action, the City alleged that the District was not exempt from the City's zoning ordinances under either Government Code section 53091 or Government Code section 53096. The third cause of action was for declaratory relief, and rested on the allegations of the first two causes of action.

In October 2016, the trial court ruled in favor of the District with respect to the first cause of action, concluding that the District did have the authority to construct and operate a solar facility. In its ruling, the trial court noted that the City had conceded that " '[e]ntering into an agreement pursuant to the State's RES-BCT Program in order to produce electricity for Edison's grid in exchange for credits for energy used by the District's other facilities may be authorized under CSDL's general powers.' " The court then explained that pursuant to the proposed Solar Project, "the electricity produced by the facility will be connected to the local electrical grid adjacent to the Project site and the electricity produced is expected to be metered into the regional grid and credits obtained to offset energy consumption by individual District facilities," demonstrating that the District's Solar Project development was being completed pursuant to the RES-BCT program. The trial court rejected the idea that the Solar Project was not eligible for the RES-BCT program, commenting that "[t]he City does not offer any argument to demonstrate the Project does not fall within the requirements of the

_____

10      The City's position was that the District lacked the authority to construct and operate a solar facility on the ground that the District had been authorized to provide only water and wastewater services, while the anticipated services associated with the Solar Project involved the provision of electricity. According to the City, the provision of electricity was beyond the scope of the District's authorization under the relevant state statutes.

State's RES-BCT program as set forth in Public Utilities Code section 2830."
On this basis, the court denied the petition for writ of mandate as to the first
cause of action.

As to the second cause of action, however, the trial court granted the
City's requested relief, issuing the writ of mandate, on the grounds that (1)
the exceptions provided for in Government Code sections 53091, subdivision
(e) and 53096, subdivision (a) did not apply to the Solar Project as a matter of
law, and (2) even if Government Code section 53096, subdivision (a) were
applicable to the Solar Project, the administrative record does not contain
substantial evidence to support the District's finding that there is no feasible
alternative to installing the solar farm at any location other than the Project
Site.[11]

The District appealed the judgment with respect to the court's ruling as
to the second cause of action—a ruling that effectively required the District to
comply with the City's zoning ordinance. (*Hesperia I*, *supra*, 37 Cal.App.5th
at p. 746.) The City did not file a cross-appeal regarding the trial court's
ruling as to the first cause of action, in which the court determined that the
District had the authority to construct and operate a solar facility to produce
electricity for SCE under the RES-BCT program. (See *id*. at pp. 745–746.)

This court affirmed the trial court's ruling with respect to the second
cause of action in favor of the City, but solely on the ground that the
administrative record did not contain substantial evidence to support the
District's no-feasible-alternative determination. (*Hesperia I*, *supra*, 37
Cal.App.5th at p. 766.) We reached that conclusion, however, after noting

---

[11]    At the City's request, the trial court ultimately dismissed the third
cause of action. (*Hesperia I*, *supra*, 37 Cal.App.5th at p. 745.)

our agreement with the trial court's conclusion that the District did possess the authority to construct and operate the Solar Project. (*Id*. at p. 759.)

D.     *The parties' actions during a stay of the appeal*

In 2017, during a nine-month stay of the appeal and before the issuance of this court's opinion in *Hesperia I*, the District applied to the City for a General Plan amendment and a conditional use permit for the Solar Project to be constructed in a location 660 feet to the north of the southern property line of the Hesperia Farms Property (the Updated Location). In August 2017, the District adopted an addendum to the Final MND and approved the Solar Project at the Updated Location.

The City's planning commission recommended that the City Council approve the District's application for the Solar Project to be completed at the Updated Location. Nevertheless, in January 2018, the City Council denied the District's application without making findings. After the District notified the City of its failure to adopt findings to support the denial of the District's application, the City Council adopted findings and reissued the denial.

E.     *The District's actions post-*Hesperia I

After this court issued its opinion in *Hesperia I*, the District retained the services of Tidewater Incorporated (Tidewater) for the purpose of preparing a technical memorandum that would evaluate the feasibility of installing a commercial solar energy system at other District-owned or District-permitted properties. Tidewater initially considered 61 potential locations for installation of an alternative energy system, all of which were parcels owned or leased by the District. Tidewater narrowed that initial list to six possible alternative sites, which it analyzed in detail according to a variety of economic, environmental, social, and technical criteria.

The District also retained the services of Sage Energy Consulting, Inc. (Sage), to conduct an evaluation of the economic feasibility of placing solar or wind installations at the six potential project sites that were identified and considered in the Tidewater technical memorandum.  Sage reviewed the financial projections from the original SunPower proposal and whether changes in the RES-BCT tariff since the contract with SunPower was entered had changed the economic feasibility of the project.  Sage concluded that the RES-BCT program was the "only feasible alternative for generating bill credits" after conducting a review of other net metering and direct offset alternatives to that program.  Sage also determined that the District's annual savings from energy generation arising from the RES-BCT program being utilized on the Hesperia Farms Property would be $160,700 (which would represent 29 percent of the District's annual electricity costs), while energy savings from the alternative sites would range from zero to $37,000, annually.

Staff at the District prepared a May 2020 report titled "Lake Arrowhead Community Services District—Alternatives to Proposed Solar Photovoltaic System on Hesperia Farms Property" (the Alternatives Report). The Alternatives Report documented the District's investigation into the possible alternatives to locating and operating the Solar Project at the Updated Location on the Hesperia Farms Property.  In the Alternatives Report, District staff identified the proposed project's objectives as including implementing a renewable energy project that would be large enough to permit efficiencies of scale and provide for adequate bill credits to offset the District's energy costs.  Staff considered and rejected "other forms of renewable energy as alternatives" to the Solar Project, including solar thermal, hydroelectric, wind, geothermal, and digester gas alternatives,

18

concluding instead that a solar photovoltaic project would be the most cost-effective and productive. Staff also identified the RES-BCT program as the only viable option that would allow the District to generate sufficient bill credits to make an alternative energy project worthwhile, based on the Sage report's review of other alternative programs such as net metering (i.e., the generation of energy to offset the use of energy at a single location).

In the Alternatives Report, District staff also considered the use of alternative sites already owned or controlled by the District, as well as other sites that the District could acquire for use. For purposes of the Alternatives Report, District staff considered only other sites for potential acquisition that were within the District's service areas—i.e., the areas to which the District provides water and/or wastewater services to the public.

District staff concluded, based on the Tidewater and Sage reports, that the District would save approximately $3.67 million and that approximately 29 percent of the District's energy costs would be offset by the Solar Project as proposed at the Updated Location over a 30-year period.

At a regularly held public meeting on June 23, 2020, the District adopted Resolution No. 2020-04, in which it determined that there was no feasible alternative to the Solar Project at the Updated Location on the District's Hesperia Farms Property. This finding rendered the City's zoning regulations inapplicable to the Solar Project at the Hesperia Farms Property, pursuant to Government Code section 53096. The District filed a notice of determination under CEQA on July 2, 2020.

F.     *The current action*

Despite the District's proposed change to the location of the Solar Project on the Hesperia Farms Property to partially comply with the City's zoning regulations, the City remained opposed to any development of a solar

19

farm at that location. In September 2020, the City filed a petition for writ of mandate and complaint, thereby initiating the litigation in this matter. The City asserts four causes of action. In the first cause of action, the City challenges the District's "use of the RES-BCT program," arguing that the District is without authority to utilize the RES-BCT program because, according to the City, the Hesperia Farms Property is not within the "geographical boundaries" of the District, as required by section 2830. In the second cause of action, the City asserts that the District's approval of the Addendum violated CEQA. In the third cause of action, the City challenges the sufficiency of the evidence to support the District's determination that there are no feasible alternatives to the Solar Project for purposes of the zoning regulations exemption under Government Code section 53096. And, in the fourth cause of action, the City seeks declaratory relief based on its first and third causes of action.

On July 12, 2021, the trial court issued a tentative ruling in which it proposed granting the City's petition for writ of mandate on the ground that the Hesperia Farms Property is not located within the District's "geographical boundary" as required by section 2830, and that therefore the District was not entitled to rely on the RES-BCT program to conclude that the Hesperia Farms Property is the only feasible alternative and thereby avoid application of the City's zoning regulations through the qualified exemption under Government Code section 53096. The trial court's tentative ruling rejected the City's other grounds for challenging the propriety of the District's no-feasible-alternative finding and the District's CEQA determinations. However, after hearing from the parties, the trial court permitted the parties to submit additional briefing on several of the District's affirmative defenses, including res judicata, collateral estoppel, statutes of

limitation, laches, and standing, and the court also permitted the parties to further brief the merits of the City's causes of action.

After receiving supplemental briefing and conducting a second hearing, the trial court revised its ruling. Instead of granting the City's petition for a writ of mandate, the trial court issued a ruling denying in full the City's petition for a writ of mandate. The trial court concluded that the City is "barred by the doctrine of laches from relying on an argument that the [Hesperia Farms Property] does not qualify for the RES-BCT program." The trial court affirmed the other determinations it had made in the tentative ruling. Given its application of laches and the other determinations, the trial court concluded that the City was unable to prevail with respect to any of its causes of action. The trial court entered a judgment in favor of the District on March 8, 2022.

The City filed a timely notice of appeal from the judgment.

III.

DISCUSSION

In this appeal, the City pursues only limited theories of error on the part of the trial court. Specifically, the City asserts that the trial court erred in concluding that laches bars it from challenging the eligibility of the Solar Project on the Hesperia Farms Property for the RES-BCT program. The City further contends that the Solar Project, as proposed on the Hesperia Farms Property, is not eligible for the RES-BCT program because the Hesperia Farms Property is not within the District's "geographical boundary" as required under section 2830.

The District encourages this court to affirm the trial court's denial of the City's petition for writ of mandate on any of multiple alternative grounds. The District contends that the trial court's laches ruling is supported by

substantial evidence and should be affirmed. The District further contends, however, that this court may also affirm the trial court's judgment in its favor with respect to the first and third causes of action because (a) the City lacks standing to challenge the District's eligibility for use of the RES-BCT program for the Solar Project as located on the Hesperia Farms Property; (b) the City failed to exhaust administrative remedies before filing this action; (c) the City's challenge to the Solar Project's eligibility for the RES-BCT program is untimely under the relevant statute(s) of limitation; (d) the City's challenge to the Solar Project's approval and reliance on the RES-BCT project is barred by the doctrine of collateral estoppel; and (e) the Solar Project is eligible for the RES-BCT program because the Hesperia Farms Property *is* within the District's geographical boundary.

The District also points out that the City failed to challenge the trial court's ruling denying the petition as to the second cause of action (the alleged CEQA violation), as well as the court's ruling as to the sufficiency of the evidence to support the District's no-feasible-alternative determination as challenged in the third cause of action.

The City concedes that it has not raised any appellate issue with respect to the second cause of action. However, the City contends that it *is* asserting that the District's no-feasible-alternative determination, which the City is challenging in the third cause of action, is not supported by sufficient evidence because the District improperly relied on the Hesperia Farms Property as being eligible for the RES-BCT program while excluding other potential locations as not being eligible for the program. Because the City's appeal touches solely on the first and third causes of action, and because the fourth cause of action rises or falls on the merits of the first and third causes

22

of action, we address the trial court's rulings with respect to the first and third causes of action only.

A.      *The parties' requests for judicial notice*

As an initial matter, we address two requests for judicial notice filed by the parties that remain pending as we consider the merits of the City's appeal.

On July 11, 2022, the District filed a request for judicial notice, asking this court to take judicial notice of five sets of documents that it identifies as follows:

> "Exhibit A:  California Bill Analysis, Senate Floor, 2007-2008 Regular Session, Assembly Bill 2466, August 12, 2008";

> "Exhibit B:  California Bill Analysis, Senate Committee, 2015-2016 Regular Session, Assembly Bill 1773, Hearing Date June 21, 2016";

> "Exhibit C:  Public Utilities Commission Resolution E-4283, Tariffs compliant with Public Utilities (PU) Code Section 2830 relating to Establishment of a Schedule for Local Government Renewable Energy Self-Generation Program, dated April 22, 2010";

> "Exhibit D:  Letter from Public Utilities Commission to Southern California Edison re Supplemental Compliance Advice Filing Pursuant to Resolution E-4283 Regarding Establishment of Schedule RES-BCT Local Government Renewable Energy Self-Generation Bill Credit Transfer, dated July 12, 2010, and attached Advice Letter 2351-E-A, dated May 3, 2010"; and

> "Exhibit E:  Public Utilities Commission Rule 21 Generating Facility Interconnections, effective April 8, 2021."

The first and second sets of documents contain some legislative history related to the original enactment of section 2830 and a later amendment to

23

the statute; the District contends that this legislative history is relevant to interpreting the phrase "geographical boundaries" as used in section 2830. The District states that the third, fourth, and fifth sets of documents are relevant to its argument that the City failed to exhaust administrative remedies before the Public Utilities Commission.

The City has opposed the District's request for judicial notice as to the first, third, fourth, and fifth sets of documents. The City notes that the second set of documents in the District's request for judicial notice is already part of the record on appeal and, as a result, there is no need for this court to take judicial notice of this set of documents. The City argues that the other four sets of documents, however, were not presented to the trial court, and that therefore this court should not consider the documents in the first instance in the absence of exceptional circumstances. The City also argues that the remaining four sets of documents are not relevant to the matters before this court, arguing that the "offered material does not support the arguments which Respondents have based on it."

After reviewing the documents that are the subject of the District's July 11, 2022 request for judicial notice, we decline to take judicial notice of the third, fourth, and fifth set of documents on the ground that these documents are not relevant to an issue that is necessary to our disposition. (See *Guarantee Forklift, Inc. v. Capacity of Texas, Inc.* (2017) 11 Cal.App.5th 1066, 1075 (*Guarantee Forklift*) [an appellate court "may decline to take judicial notice of matters not relevant to dispositive issues on appeal"].) As we explain further in part III.B. *post*, we conclude that the trial court's judgment with respect to the first cause of action should be affirmed on the grounds on which the trial court ruled, as well as on the alternative ground that, on the merits, the City has failed to demonstrate that the Solar Project,

24

as proposed on the Hesperia Farms Property, is ineligible for the RES-BCT program as a result of the location not being within the "geographic boundaries" of the District.  As a result, we have no need to consider the District's alternative argument for affirmance that the City failed to exhaust administrative remedies.

We also decline to take judicial notice of the first set of documents, titled by the District as "California Bill Analysis, Senate Floor, 2007-2008 Regular Session, Assembly Bill 2466, August 12, 2008," albeit not because we view the documents as irrelevant.  Rather, it is clear that these legislative history materials have been published, and, as such, there is no need for this court to take judicial notice of these materials:  "A motion for judicial notice of published legislative history, such as the Senate analysis here, is unnecessary.  [Citation.]  'Citation to the material is sufficient.  [Citation.] We therefore consider the request for judicial notice as a citation to those materials that are published.'  [Citation.]"  (*Wittenberg v. Beachwalk Homeowners Assn.* (2013) 217 Cal.App.4th 654, 665, fn. 4, quoting *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 45–46, fn. 9.)

Although we decline to take judicial notice of the first set of documents, we nevertheless consider them, as they are the type of material that may be considered as an indication of the Legislature's intent in enacting a particular statute.  (See *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 37 [identifying list of documents that have been held to constitute cognizable legislative history as including bill histories, legislative committee reports and analyses, bill digests, Office of Assembly Floor Analyses, and Office of Senate Floor Analyses].)  As we discuss further in part II.B.2., *post*, we consider various aspects of the legislative history of section 2830, insofar as it is helpful to our

25

understanding of the Legislature's intentions in creating the RES-BCT program.

On August 11, 2022, the City filed a request for judicial notice, seeking to have this court judicially notice five documents that had been included in the record in *Hesperia I*. The City identifies the documents that are the subject of its motion for judicial notice as follows:

> "Exhibit 1: [The District's] Answer to Petition for Writ of Mandate; Complaint for Declaratory and Injunctive Relief";
>
> "Exhibit 2: Real Party in Interest SunPower Corporation, Systems' Verified Answer to Petitioner City of Hesperia's Petition for Writ of Mandate; Complaint for Declaratory and Injunctive Relief";
>
> "Exhibit 3: Petitioners' Opening Brief in Support of Petition for Writ of Mandate";
>
> "Exhibit 4: Respondents' Opposition to Petition for Writ of Mandate"; and
>
> "Exhibit 5: Petitioner's Reply Brief in Support of Petition for Writ of Mandate."

The City contends that these documents are relevant to whether it may be collaterally estopped from litigating the eligibility of the Solar Project on the Hesperia Farms Property for the RES-BCT program.

Although the District has not opposed the City's request for judicial notice, we nevertheless decline to take judicial notice of these documents because we have no need to consider whether the City should be collaterally estopped from litigating the eligibility issue, given our conclusion that the trial court's judgment as to the first cause of action should be affirmed on other grounds. (See *Guarantee Forklift*, *supra*, 11 Cal.App.5th at p. 1075.)

26

B    *The trial court did not err in declining to grant a writ of mandate as to the City's first cause of action, which is based on the City's challenge that the Hesperia Farms Property "is not located within the geographical boundaries of the District"*

In its first cause of action, which the City titles "Petition for Writ of Mandate - Code of Civil Procedure § 1085," the City "challenges the District's use of the RES-BCT program for its Solar Project because it is not located within the 'geographical boundary of the local government' for purposes of the requirements of Public Utilities Code section 2830."  In connection with this cause of action, the City sought issuance of "a temporary restraining order and preliminary injunction restraining Respondents and Real Parties in Interest from taking action to carry out the Project pending trial" and/or "a peremptory writ of mandate directing Respondents shall not proceed with the Solar Farm Project."

1. *The trial court's application of laches to bar the City's assertion that the Solar Project is ineligible for the RES-BCT program is supported by the record and does not constitute an abuse of discretion*

Although the trial court declined to rule in favor of the City on the first cause of action, it did so because it determined that the District had succeeded in demonstrating that the affirmative defense of laches applied to bar the City's claim that the Solar Project, as planned on the Hesperia Farms Property, was not eligible for the RES-BCT program.  Because the trial court found that laches was a determinative issue, we begin our consideration of the correctness of the trial court's judgment by reviewing its determination that the District's affirmative defense of laches operates to bar the City from

27

pursuing a challenge to the Solar Project's eligibility for the RES-BCT program.[12]

"Laches is an equitable, affirmative defense which requires a showing of both an unreasonable delay by the plaintiff in bringing suit, ' "plus either acquiescence in the act about which plaintiff complains or prejudice to the defendant resulting from the delay." ' " (*Highland Springs Conference & Training Center v. City of Banning* (2016) 244 Cal.App.4th 267, 282.)  As described by the United States Supreme Court, "laches is a defense developed by courts of equity." (*Petrella v. MGM* (2014) 572 U.S. 663, 678.)  Thus, "[t]he doctrine of laches applies in equitable actions alone" (*Blue Cross of Northern California v. Cory* (1981) 120 Cal.App.3d 723, 743–744), and it may be asserted as a defense in "an equitable action seeking a writ of mandamus" (*Julian Volunteer Fire Co. Assn. v. Julian-Cuyamaca Fire Protection Dist.* (2021) 62 Cal.App.5th 583, 601; see *Conti v. Board of Civil Service Comm'rs* (1969) 1 Cal.3d 351, 357, fn. 3 [recognizing authority demonstrating that the defense of laches may be invoked in an administrative mandamus proceeding]).

To establish a successful affirmative defense based on laches, a defendant must show that the plaintiff unreasonably delayed in filing suit, together with either the plaintiff's acquiescence in the conduct about which it complains *or* prejudice to the defendant because of the delay.  (*Miller v. Eisenhower Medical Center* (1980) 27 Cal.3d 614, 624 (*Miller*); see *Highland Springs Conference & Training Center v. City of Banning* (2016) 244 Cal.App.4th 267, 282 ["Laches is an equitable, affirmative defense which

---

[12]    Although the laches ruling was fundamental to the trial court's decision to deny the City's writ petition, the City only begins to address the issue of laches on page 53 of its opening brief, and devotes a total of approximately five pages to the issue.

requires a showing of both an unreasonable delay by the plaintiff in bringing suit, ' "plus either acquiescence in the act about which plaintiff complains or prejudice to the defendant resulting from the delay." ' "].)  "The basic elements of laches are:  (1) an omission to assert a right; (2) a delay in the assertion of the right for some appreciable period; and (3) circumstances which would cause prejudice to an adverse party if assertion of the right is permitted."  (*Stafford v. Ballinger* (1962) 199 Cal.App.2d 289, 296.)

"[T]he defense of laches may operate as a bar to a claim by a public administrative agency . . . if the requirements of unreasonable delay and resulting prejudice are met."  (*Robert F. Kennedy Medical Ctr. v. Belshe* (1996) 13 Cal.4th 748, 760, fn. 9 (*Robert F. Kennedy Medical Ctr.*); accord, *Krolikowski v. San Diego City Employees' Retirement System* (2018) 24 Cal.App.5th 537, 568 (*Krolikowski*); *Cedars-Sinai Medical Center v. Shewry* (2006) 137 Cal.App.4th 964, 985–986 (*Cedars-Sinai Medical Center*).)

Although the showing necessary to assert a successful laches defense is clear, the standard of review applicable to a trial court's determination regarding the defense of laches is not.  Often authorities identify the standard of review applicable to a trial court's allowance of laches as one of review for substantial evidence.  (See, e.g., *Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 67; *Lent v. California Coastal Com.* (2021) 62 Cal.App.5th 812, 837; *Marshall v. Marshall* (1965) 232 Cal.App.2d 232, 252; *Teixeira v. Verissimo* (1966) 239 Cal.App.2d 147, 158.)  However, other authorities have stated that a trial court's laches determination is reviewed for an abuse of the trial court's discretion.  (See, e.g., *Straley v. Gamble* (2013) 217 Cal.App.4th 533, 537; *Luxury Asset Lending, LLC v. Philadelphia Television Network, Inc.* (2020) 56 Cal.App.5th 894, 913 [noting that application of laches defense "is entrusted to the discretion of the trial court

29

and such discretion usually goes undisturbed by the appellate tribunal"]; *Piscioneri v. City of Ontario* (2002) 95 Cal.App.4th 1037, 1046 [in the absence of " 'palpable abuses of discretion,' " a trial court's " 'finding of laches will not be disturbed on appeal' "].)

Elsewhere, the standard of review applicable to a trial court's decision to apply or reject a laches defense has been stated as follows: "Generally speaking, the existence of laches is a question of fact to be determined by the trial court in light of all of the applicable circumstances, and in the absence of manifest injustice or a lack of substantial support in the evidence its determination will be sustained. [Citations.]" (*Miller*, *supra*, 27 Cal.3d at p. 624.) In other words, an appellate court is to review trial court laches determinations for "manifest injustice" *or* for "lack of substantial . . . evidence" (*ibid.*), which appears to reflect application of a mixed standard of review—i.e., review for abuse of discretion and substantial evidence. Under this standard, an appellate court defers to the trial court's weighing of the equities of the delay and prejudice and affirms so long as the application or

denial of laches does not result in manifest injustice, but considers whether the trial court's factual findings are supported by substantial evidence.[13]

We conclude that a dual/mixed standard of review seems most appropriate when assessing a trial court's determination that laches operates to prevent a plaintiff from being entitled to relief on a belatedly-raised claim, given that a trial court must determine not only what the underlying facts are, but also whether such facts weigh in favor of applying the affirmative defense of laches to bar the plaintiff's claim.[14]

---

[13]    To make things even more complex, another standard of review has been identified as applicable in situations in which a trial court *declines* to apply laches to bar a plaintiff's claim. This standard of review stems from the fact that laches is an affirmative defense as to which the defendant has the burden of proof: " 'In the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. . . .' " (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838.) Instead, " 'the question for a reviewing court [where a trial court has concluded a defendant has not carried its burden with respect to an affirmative equitable defense] becomes whether the evidence compels a finding in favor of the appellant as a matter of law' " because " 'the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Ibid.*; see *Eisen v. Tavangarian* (2019) 36 Cal.App.5th 626, 647 [applying similar standard to appeal from trial court's denial of the defenses of waiver and estoppel]; *Atkins v. City of Los Angeles* (2017) 8 Cal.App.5th 696, 734 [applying similar standard to an employer's defense of undue hardship in an action under the Fair Employment and Housing Act].)

[14]    As a practical matter, it appears obvious that if there is no substantial evidence to support the trial court's findings, or if the application of the facts does not warrant the court's ultimate conclusion or if manifest injustice would result from application of the doctrine, the trial court's ruling would necessarily constitute an abuse of the court's discretion.

In its opening brief, the City's sole argument as to why the trial court erred in concluding that laches barred its claim that the Solar Project is not eligible for the RES-BCT program is that "[l]aches is not applicable in this case" because, the City asserts, "laches may not be raised against a governmental agency, 'where there is no showing of manifest injustice to the party asserting laches, and where application of the doctrine would nullify a policy adopted for the public protection.' " The City cites *Morrison v. Cal. Horse Racing Bd.* (1988) 205 Cal.App.3d 211, 219 (*Morrison*), for this proposition.

Even assuming the statement of the law in *Morrison* is a correct statement of the law (but see *Lent v. California Coastal Com.* (2021) 62 Cal.App.5th 812, 837 [" 'Under appropriate circumstances, the defense of laches may operate as a bar to a claim by a public administrative agency . . . if the [typical] requirements of unreasonable delay and resulting prejudice are met' "]), the City's assertion fails to acknowledge that in this case, there are two *competing* public policies adopted for the public's benefit that are at stake—not just one. While it seems clear that a municipality's zoning regulations are typically adopted for the public's benefit, it is equally apparent that public benefit is the impetus for the state's policy of encouraging local government energy users to generate energy through renewable sources to meet their energy usage needs. Renewable energy sourcing not only serves the public's interest through the indirect environmental benefits, but it also provides a direct benefit to the public by ensuring adequate energy supplies exist for the state. (See, e.g., Pub. Res. Code, § 25001 ["The Legislature hereby finds and declares that electrical energy is essential to the health, safety and welfare of the people of this state and to the state economy, and that it is the responsibility of state government

to ensure that a reliable supply of electrical energy is maintained at a level consistent with the need for such energy for protection of public health and safety, for promotion of the general welfare, and for environmental quality protection."]; California Public Utilities Commission, Energy Storage Phase 2 Interim Staff Report—January 4, 2013, p. 17 ["The Energy Action Plan of 2005 (EAP) is a joint agency document intended to guide the procurement decisions of the State of California. The term 'preferred resource' is a term of art that emanated from the EAP, which stated a policy that California should meet future electric resource needs in the following 'Loading Order:  Energy efficiency  · Renewable resources  · Clean fossil fuels."].)  In fact, the public policy favoring the assurance of adequate and necessary energy supplies to the citizens of the state underlies Government Code section 53096's qualified zoning exemption for facilities that involve the "transmission" of electrical energy where there is no feasible alternative to the local agency's proposal— i.e., the statutory authority pursuant to which the District made its determination that the Solar Project was exempt from the City's zoning regulations.

It is thus clear that this matter is wholly unlike *Morrison*, *supra*, 205 Cal.App.3d at page 219, and *Mary R. v. B. & R. Corp.* (1983) 149 Cal.App.3d 308, 315–316, the authority on which *Morrison* relies.  In neither of these cases was there a public policy supporting the party asserting laches; the only public policy that was at issue was that of the party attempting to avoid the application of laches.  Given the nature of this action as involving competing public policies, as well as authority demonstrating that laches *may* be applied to bar a claim made by a public agency (see, e.g., *Robert F. Kennedy Medical Ctr.*, *supra*, 13 Cal.4th at p. 760, fn. 9; accord, *Krolikowski*, *supra*, 24 Cal.App.5th at p. 568; *Cedars-Sinai Medical Center*, *supra*, 137 Cal.App.4th

33

at pp. 985–986), we reject the City's contention that laches was not an available legal doctrine on which the trial court could rely to bar the City's belated RES-BCT program eligibility argument. We therefore consider the trial court's application of laches in this case.

In ruling that laches applies to bar the City from raising its contention that any solar project undertaken by the District on the Hesperia Farms Property is not eligible for the RES-BCT program, the trial court made detailed findings and concluded that "the City has unreasonably delayed raising the issue that the Hesperia Farms site does not qualify for the RES-BCT program to the prejudice of the District." To support this determination, the court found that the City "was aware of the District's intent to proceed under the RES-BCT program . . . since at least November 18, 2014, when District staff met with the City Manager and the Planning Department to discuss the solar facility." The court further indicated that, at a minimum, the City had to have been aware of the District's planned use of the RES-BCT program in 2015, once the District publicly entered into the Interconnection Agreement with SCE under the RES-BCT program. The trial court expressed concern that the City failed to raise the issue of the Solar Project's eligibility for the RES-BCT program during the 2016 lawsuit. As the trial court noted, the City "was aware of the issue and could have raised it [in the trial court in the 2016 lawsuit] as evidenced by its argument submitted on appeal [in the prior litigation]," but the City "offer[ed] no explanation for [its] delay in raising the eligibility issue that could have been raised and addressed" in that litigation.

The record supports the trial court's conclusions in this regard, as the City's approach to this issue throughout the *five-year delay* during which the City failed to bring a claim challenging the Solar Project's RES-BCT

34

eligibility, and particularly in the context of the 2016 lawsuit, demonstrates that the delay was unreasonable and the City's conduct operated to induce the District into believing that the question of the eligibility of the Solar Project for the RES-BCT program was not being challenged. Not only did the City never raise a question as to the Hesperia Farms Property's eligibility for the RES-BCT program during its discussions with the District prior to the District's initial approval of the Solar Project, but, notably, the City's 2016 petition for a writ of mandate did not challenge or even question the Solar Project's eligibility for the RES-BCT program based on its proposed location on the Hesperia Farms Property.

In its reply brief, the City argues that the record does not demonstrate that it knew about the District's plan to use the RES-BCT program for the Solar Project in 2014 or 2015. However, the record need only demonstrate that the City was on inquiry notice regarding the issue: "In order to impute laches to one who seeks relief in equity, it should clearly appear that he either had actual knowledge of the facts *or failed to acquire such knowledge after having notice thereof*. [Citation.]" (*McNulty v. Lloyd* (1957) 149 Cal.App.2d 7, 10–11, italics added.) Further, the record supports the reasonable inference that the City *was* aware of the plan by the District to utilize a program available to governmental entities that would allow it to generate electrical energy at the Hesperia Farms Property, transport that energy to the grid, and be credited for that energy against the cost of its energy consumption at other facilities—i.e., the RES-BCT program. For example, the City argues that the administrative record does not support the trial court's finding with respect to the City's awareness of the District's intent to use the RES-BCT program as of November 18, 2014, because the record citation on which the trial court relied states only that on that date

35

" 'District staff met with the City Manager and members of the Planning Department at the City of Hesperia to discuss *the permitting process* for a solar facility on the Hesperia Farms Property.' " According to the City, this statement does not indicate that District staff mentioned the "Interconnection Agreement, the RES-BCT program, or Section 2830." However, a fair reading of the record supports the reasonable inference that the discussions between City staff and District staff involved the details of the proposed project, including its size, location, and the reason for the project—i.e., the plan by the District to utilize a solar farm at the Hesperia Farms Property to offset the cost of the District's energy use elsewhere, which would only be possible through the state's RES-BCT program.

The City also argues that the District's August 2015 approval of the Interconnection Agreement is insufficient to demonstrate that the City had knowledge about the Interconnection Agreement or the planned use of the RES-BCT program. However, the District approved the Interconnection Agreement with SCE at a publicly-noticed and open meeting, and the Interconnection Agreement itself references the fact that the District would be "export[ing] electrical energy to the grid pursuant to the . . . RES-BCT [program]." The law places on every person a duty to inquire as to facts which that person could learn with reasonable diligence: "Every person who has actual notice of circumstances sufficient to put a prudent [person] upon inquiry as to a particular fact, has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he [or she] might have learned that fact." (Civ. Code, § 19.) Because of the District's public notice of the meeting and the proposed actions to be taken at the meeting, the City was on notice of facts from which it should have been aware of the District's entering into Interconnection Agreement.

36

Beyond this, the record demonstrates, even without the need for reasonable inferences, that the City was *actually* aware of the fact that the District planned to rely on the RES-BCT program no later than December 2015.  A December 14, 2015 letter from a "Principal Planner" at the City to the District expressly demonstrates that the City was well aware of the District's planned use of the RES-BCT program:  "The energy . . . generated by the solar farm is not being used for the District's facilities.  Its purpose *is to transmit energy into the grid in order to gain credits for districtwide operations*."  Moreover, the City's own petition initiating the 2016 lawsuit makes it clear that the City was aware of the District's plan to utilize the RES-BCT program.  Among the allegations in the petition is the City's assertion that in August 2015, the District "entered into a Generator Interconnection Agreement for the project with Edison."  Given that the Interconnection Agreement itself described its purpose as the exportation of electricity to the grid pursuant to the RES-BCT program, the City cannot reasonably argue that it was not aware of the District's plan to rely on the RES-BCT program in the construction and operation of the Solar Project at least by the time it filed its 2016 lawsuit, and the record supports the conclusion that the City was aware of the planned use of the RES-BCT program for the Solar Project much earlier than the initiation of the 2016 lawsuit.

Nevertheless, the City did not raise any issue regarding the eligibility of the Solar Project on the Hesperia Farms Property for the RES-BCT program in its 2016 lawsuit.  Despite the fact that the City opted not to include a cause of action challenging the Solar Project's eligibility for the RES-BCT program in the 2016 lawsuit, it is clear that the trial court in that action understood that the issue of the Solar Project's eligibility for the RES-

BCT program was fundamental to the question that the City had raised in its petition for a writ of mandate in that action—i.e., whether the District was authorized to develop and operate the Solar Project. The trial court's ruling in the 2016 lawsuit *specifically addressed the District's authority to build and operate the Solar Project on the Hesperia Farms Property pursuant to the RES-BCT program*. The trial court found that the City had conceded that " '[e]ntering into an agreement pursuant to the State's RES-BCT Program in order to produce electricity for Edison's grid in exchange for credits for energy used by the District's other facilities may be authorized under CSDL's general powers,' " and further found that the proposed Solar Project would utilize the RES-BCT program by having the "electricity produced by the facility . . . connected to the local electrical grid adjacent to the Project site and the electricity produced . . . metered into the regional grid and credits obtained to offset energy consumption by individual District facilities." The trial court also rejected the idea that the Solar Project was *not* eligible for the RES-BCT program, stating that "[t]he City does not offer any argument to demonstrate the Project does not fall within the requirements of the State's RES-BCT program as set forth in Public Utilities Code section 2830." This ruling formed the basis of the trial court's denial of the City's petition for writ of mandate as to the first cause of action. Yet, despite this determination by the trial court in the 2016 lawsuit, the City did *not cross-appeal from the trial court's judgment* to challenge the trial court's ruling that the District was authorized to build and operate the Solar Project pursuant to the RES-BCT program. In taking this approach, the City effectively communicated that it

had accepted the trial court's ruling in this regard, and was conceding its correctness.[15]

Moreover, even *after* the issuance of the opinion in *Hesperia I*, the City never again raised the question of the Solar Project's eligibility for the RES-BCT program until it filed suit again. Thus, while the District continued to move forward with its new alternatives analysis, the City gave no indication to the District that it would be raising a challenge to the Solar Project's RES-BCT eligibility years after the District had entered into the Interconnection Agreement.

Not only does the record support the trial court's determinations regarding the City's undue delay in bringing a claim challenging the Solar Project's eligibility for the RES-BCT program, but the record also supports the trial court's finding that the City's delay prejudiced the District. For purposes of laches, " ' " '[a] defendant has been prejudiced by a delay when the . . . defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed.' " ' " (*George v. Shams-Shirazi*

---

[15] The District also argues that the City is barred from raising the question of the Solar Project's eligibility for the RES-BCT program on issue preclusion grounds. "*Issue preclusion* prohibits the relitigation of issues argued and decided in a previous case, even if the second suit raises different causes of action. [Citation.] Under issue preclusion, the prior judgment conclusively resolves an issue actually litigated and determined in the first action." (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 824.) Issue preclusion applies if there was (1) a final adjudication (2) of an identical issue (3) that was actually litigated, (4) necessarily decided, and (5) asserted against one who was a party in the first suit or one in privity with that party. (*Id*. at p. 825.) We need not consider whether all of the requisite elements are met in this case because the trial court relied on laches to deny the City relief, and we conclude that the trial court's laches ruling is supported by the record and does not constitute an abuse of discretion.

(2020) 45 Cal.App.5th 134, 142; see *Magic Kitchen LLC v. Good Things Internat., Ltd.* (2007) 153 Cal.App.4th 1144, 1161.)

The trial court reasonably concluded that after the 2016 lawsuit and appeal, the District continued to treat the "Hesperia Farms site as [a] feasible [location for the Solar Project], with the only [remaining issue it had to address] being whether substantial evidence supported a finding that there was 'no feasible alternative' to that location." The record supports the trial court's determination that the District expended additional money, time and effort pursuing the alternatives analysis. For example, the record demonstrates that the District retained and paid for the assistance of two outside companies to undertake technical analyses and develop reports after the District was told by this court in *Hesperia I* that it would be properly exempt from the City's zoning regulations only once it successfully demonstrated there was no feasible alternative to the Solar Project. The District pursued the alternatives analysis and continued to move forward in developing the Solar Project because there was no reason for it to believe that there remained a real question as to the eligibility of the Solar Project as planned on the Hesperia Farms Property for the RES-BCT program; rather, it appeared that the only remaining issue was whether there was a feasible alternative to the Hesperia Farms Property site for an alternative energy project. Further, the City's multi-year delay in raising any challenge to the Solar Project's eligibility for the RES-BCT program has placed the District's ability to obtain the RES-BCT tariff credits at risk. The RES-BCT program has a statewide program limit of 250 megawatts, and the state's utilities are required to offer service under the RES-BCT program tariff only until each

40

utility reaches its proportionate megawatt share of the program.[16] SCE's proportionate share of the statewide 250 megawatt limit is 123.8 megawatts; once SCE reaches the 123.8 megawatt limit, SCE will no longer have to honor the RES-BCT tariff credit for governmental agencies seeking to pursue alternative off-site energy generation.

Nevertheless, the City argues that the District was not prejudiced by its delay in asserting the ineligibility of the Solar Project for the RES-BCT program because, according to the City, the District would have needed to go through the City's zoning process or conduct an alternatives analysis, regardless whether the City raised the RES-BCT eligibility issue earlier or not. However, if the District had known that the City would bring up an issue that it could have raised in the prior litigation and that the District's entire plan for the Solar Project was at risk from a determination that the Hesperia Farms Property was not eligible for the District's use of the RES-BCT program, it might have decided to seek a ruling as to that issue first, *before* undertaking the costly and time-consuming alternatives analysis. Alternatively, it might have made very different decisions about whether to

---

[16] Subdivision (h) of section 2830 provides for the limitation in how much total wattage is available for the RES-BCT program statewide: "An electrical corporation is not obligated to provide a bill credit to a benefiting account that is not designated by a local government prior to the point in time that the combined statewide cumulative rated generating capacity of all eligible renewable generating facilities within the service territories of the state's three largest electrical corporations reaches 250 megawatts. Only those eligible renewable generating facilities that are providing bill credits to benefiting accounts pursuant to this section shall count toward reaching this 250-megawatt limitation. *Each electrical corporation shall only be required to offer service or contracts under this section until that electrical corporation reaches its proportionate share of the 250-megawatt limitation based on the ratio of its peak demand to the total statewide peak demand of all electrical corporations*." (Italics added.)

pursue the Solar Project at all, and it could have abandoned undertaking any alternatives analysis with respect to the Solar Project if the analysis would have been futile in a scenario where the Solar Project itself was determined ineligible for the RES-BCT program.

The City also argues that the " 'mere expenditure of money or effort on the part of a defendant is insufficient to show prejudice.' "  However, the authority quoted by the City makes clear that the "mere expenditure of money or effort on the part of a defendant is insufficient to show prejudice" only in a particular situation—i.e., where the "expenditures" at issue "*were not induced by the alleged delay* in bringing this action." (*Austin v. Hallmark Oil Co.* (1943) 21 Cal.2d 718, 735, italics added.)  Here, the record demonstrates that the District was relying on the RES-BCT program from the very beginning of its interest in developing an alternative energy project at the Hesperia Farms location; if the District had been aware that the City was objecting to the Solar Project's eligibility for the program from the start, the District may have declined to spend years of time and expense in

pursuing the Solar Project and could have focused its efforts for energy cost reductions elsewhere.[17]

In its reply brief in this case, the City also attempts to suggest that its raising of the RES-BCT program eligibility issue (for the first time) in its opposition brief on appeal in the 2016 lawsuit somehow placed the District "on notice before it even adopted the resolution that is the subject of this case that the City was finally aware of the location issue and would raise it." However, as we have indicated, the manner in which City approached this issue was likely to have induced the District into believing that the City had acquiesced on the RES-BCT program eligibility question—not that the City would press the issue again at a later point in time. If the City believed that the question of RES-BCT program eligibility remained at issue, it could have filed a cross-appeal from the trial court's ruling in the 2016 litigation that the

---

[17] One of the fundamental benefits the District is seeking as a result of the construction and maintenance of a solar energy farm on the Hesperia Farms Property derives from the credits the District would be able to obtain and apply to offset the cost of its energy consumption at other facilities through the state's RES-BCT program, which is unique in this regard. (See Sen. Energy, Utilities and Com. Committee, Analysis of Assembly Bill No. 2466 (2007-2008 Reg. Sess.), as amended June 12, 2008 ["[T]here is a common theme with [programs to encourage customers to meet their own electrical generation needs]—each generally involves a customer installing small scale renewable power on the customer's side of the meter to offset their load and in some instances generate excess power. . . . [¶] . . . [¶] The . . . intent [of Assembly Bill No. 2466] is to allow local government entities to credit energy produced from renewable resources owned by the local entity against their electrical usage on more than just the facility where the renewable generator is located. The author believes that current law does not allow a local government entity to maximize renewable electricity potential at some locations because current program that would allow the local government to sell its excess power back to the utility under a FIT is not as economically beneficial to the local government as using the renewable electricity to offset the government's own demand at other locations."].)

District possessed the authority to develop and operate the Solar Project—a determination that included the trial court's conclusion that the Solar Project was eligible for the RES-BCT program. The City did not do so. Instead, the City raised the issue only in its response brief to the District's appeal—a decision that had the effect of forfeiting the issue. (See, e.g., *Celia S. v. Hugo H.* (2016) 3 Cal.App.5th 655, 665 [respondents who fail to file a cross-appeal cannot claim error in connection with opposing party's appeal]; *Preserve Poway v. City of Poway* (2016) 245 Cal.App.4th 560, 585 [" 'To obtain affirmative relief by way of appeal, respondents must themselves file a notice of appeal and become cross-appellants.' "].) Thus, the way in which the City "raised" this issue in the appeal in the 2016 lawsuit certainly did not place the District on notice that the City believed the issue remained unsettled and planned to raise the RES-BCT eligibility issue at a later date.

The City also suggests that laches should not apply because "this is a new case . . . involving a new decision by the District." However, the Solar Project is the very same Solar Project that the District has been pursuing since at least 2014, albeit with a de minimis adjustment of the site 660 feet away from the southern property line in order to satisfy at least one of the City's zoning requirements. The District has never veered from its initial selection of the Hesperia Farms Property as the location for the Solar Project during the five-plus years that the City and the District have been embroiled in a dispute over the project. Not only has the Solar Project's proposed location always been the Hesperia Farms Property, but nothing has changed with respect to the language of section 2830 or the RES-BCT program requirements that would have raised a new question about whether a solar farm on the Hesperia Farms Property would be eligible to utilize the RES-BCT program. In other words, everything about the planning for the Solar

44

Project and the statutory framework of the RES-BCT program was such that the City *could have raised its question about the eligibility of the Solar Project for the RES-BCT program in 2016*; there is nothing about the District's second attempt to make a supportable no-feasible-alternative finding or the state of the law that suddenly triggered a new claim about the eligibility of the Solar Project for the RES-BCT program only after the 2016 lawsuit concluded. The mere fact that the City appears to have considered the potential usefulness of the question only after the trial court in the 2016 lawsuit seems to have identified and addressed the issue does not mean that the underlying facts were new or that the City's claim arose at that point in time; it simply means that the City did not understand the legal effect of the facts at the time and failed to bring a claim that existed as surely in 2016 as it did when the City finally decided to raise the claim in this action.

As the trial court in this action determined, allowing the City to take a second bite of the proverbial apple at this point in time would be unjust to the District. By delaying raising this issue for multiple years *after* the District entered into the Interconnection Agreement for the purpose of developing the Solar Project—when the City could have raised the issue prior to or even during the 2016 lawsuit—the City has prejudiced the District by not only inducing the District to pursue the Solar Project through lengthy and costly litigation and technical analysis, but by placing at risk the District's ability to benefit from the 2015 Interconnection Agreement that it entered with SCE.

We therefore conclude that the trial court did not abuse its discretion in concluding that laches prevents the City from raising the question of the Solar Project's eligibility for the RES-BCT program.

45

2. *Even if the trial court had erred with respect to the laches ruling, the City cannot demonstrate that the Solar Project is ineligible for the RES-BCT program*

Although the trial court determined that it would have ruled in favor of the City but for the court's determination that laches applied to bar the City's belated assertion of the Solar Project's ineligibility for the RES-BCT program, we reach a different conclusion on the merits of the eligibility question. Our conclusion in this regard provides an alternative basis for our affirmance of the trial court's denial of the City's petition with respect to the first cause of action.

The City alleges in the first cause of action that the Hesperia Farms Property is not within the District's "geographical boundary," as that term is used in subdivision (a)(4)(C) of section 2830. The District disagrees. In the context of a trial court's denial of a writ of mandate, we review de novo an issue that turns on a question of statutory interpretation. (See, e.g., *California Manufacturers & Technology Assn. v. Office of Environmental Health Hazard Assessment* (2023) 89 Cal.App.5th 756, 769; *California Charter Schools Assn. v. City of Huntington Park* (2019) 35 Cal.App.5th 362, 369; *Walker v. City of San Clemente* (2015) 239 Cal.App.4th 1350, 1363.)

In considering an issue of statutory interpretation, " 'our primary task is to determine the lawmakers' intent.' " (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1082.) " 'We start with the statute's words, which are the most reliable indicator of legislative intent.' [Citation.] ' "We interpret relevant terms in light of their ordinary meaning, while also taking account of any related provisions and the overall structure of the statutory scheme to determine what interpretation best advances the Legislature's underlying purpose." ' [Citations.] 'If we find the statutory language ambiguous or subject to more than one interpretation, we

46

may look to extrinsic aids, including legislative history or purpose to inform our views.' [Citation.]" (*In re A.N.* (2020) 9 Cal.5th 343, 351–352.)

Section 2830 was first introduced in February 2008 as Assembly Bill No. 2466. The statute sets out a number of interrelated provisions that create the RES-BCT program; it was created in order "to allow local government entities to credit energy produced from renewable resources owned by the local entity against their electricity usage on more than just the facility where the renewable generator is located." (Assem. Com. on Utilities and Commerce, Bill Analysis Report Assem. Bill No. 2466 for hearing April 7, 2008 (2007-2008 Reg. Sess.), as introduced.)

As section 2830 reads currently (and at the time that the City filed this action), it references the "geographical boundary" or "geographical boundaries" of a governmental entity with respect to its definition of a "[b]enefiting account"—i.e., the account to which any credits earned through a renewable generating facility are applied to offset the governmental entity's energy cost burden—and with respect to its definition of an "[e]ligible renewable generating facility"—i.e., the facility that generates the energy credits with which the governmental entity will be credited.[18]

As relevant here, section 2830 defines a "[b]enefiting account" in part as follows:

> "(1) 'Benefiting account' means an electricity account, or more than one account, that satisfies any of the following:

---

[18]    Section 2830 was amended in 2021, effective January 1, 2022, to add tribes to the list of governmental entities authorized to utilize the RES-BCT program. (Stats. 2021, ch. 141 (Sen. Bill No. 479), § 1, eff. Jan. 1, 2022.) The amendment to section 2830 that occurred during the pendency of this action has not altered the statutory language at issue in this matter, and we therefore use the current statutory language unless a prior version of the statutory language is relevant to a particular point.

47

"(A) The account or accounts are located within the *geographical boundaries* of a local government or, for a campus, within the geographical boundary of the city, county, or city and county in which the campus is located, with the account or accounts being mutually agreed upon by the local government or campus and an electrical corporation." (§ 2830, subd. (a)(1)(A), italics added.)

Section 2830 also sets out the definition of an "[e]ligible renewable generating facility" as follows:

"(4) 'Eligible renewable generating facility' means a generation facility that meets all of the following requirements:

"(A) Has a generating capacity of no more than five megawatts.

"(B) Is an eligible renewable energy resource, as defined in Article 16 (commencing with Section 399.11) of Part 1.

"(C) Is located within the *geographical boundary* of the local government or, for a campus, within the geographical boundary of the city or city and county, if the campus is located in an incorporated area, or county, if the campus is located in an unincorporated area or, for a tribe, on land owned by or under the jurisdiction of the tribe.

"(D) Is owned by, operated by, or on property under the control of the local government, campus, or tribe.

"(E) Is sized to offset all or part of the electrical load of the benefiting account. For these purposes, premises that are leased by a local government, campus, or tribe are under the control of the local government, campus, or tribe."
(§ 2830, subd. (a)(4), italics added.)

Section 2830 does not provide a definition of the terms "geographical boundaries" and "geographical boundary,"[19] and there is no definition provided elsewhere within the Public Utilities Code.  We also have not found a definition of the "geographical boundary" in the regulations issued by the Public Utilities Commission.

Therefore, in order to give meaning to the phrase "geographical boundary," we begin by looking to the words themselves to discern what the Legislature intended by stating that an eligible renewable generating facility is to be "located within the geographical boundary of the local government." (See *In re A.N.*, *supra*, 9 Cal.5th at p. 351 [first step in statutory analysis is to look at the words of the statute to discern legislative intent].)  As the City notes, the Merriam-Webster Dictionary defines the word "geography" to include " 'a science that deals with the description, distribution, and interaction of the diverse physical, biological, and cultural features of the earth's surface' " and " 'the geographic features of an area.' " (https://www.merriam-webster.com/dictionary/geography, as of April 26, 2022.)  In common understanding, therefore, "geographical" is an adjective suggesting a relationship to land.  A "boundary" is " 'something that indicates or fixes a limit or extent.' "  (See <https://www.merriam-webster.com/dictionary/boundary> [as of July 12, 2023 - <https://perma.cc/7H93-ANZH>].)  Thus, the most reasonable interpretation of the phrase "geographical boundary of a local government" is that it refers to a fixed demarcation of a physical area of land governed by a local government; in other words, the "geographical boundary of a local

---

19    For ease of reference, we will generally refer to the singular "geographic boundary," but we intend for our discussion to cover both the singular and plural forms of the phrase.

49

government" as used in section 2830 refers to an area that is subject to the governing authority of the local government at issue.[20]

In applying this meaning of the phrase "geographical boundary of a local government," we begin with the understanding that the area over which a governmental entity "governs" must be considered in relationship to the *purpose, functions, and powers* of the governmental entity at issue. This is because the governing authority of a particular governmental entity depends on the nature of that governmental entity and the functions with which it has been tasked. For example, a city or county is typically a general-purpose agency that engages in a broader variety of functions and has a greater number of powers than a special purpose agency, like the District, which is often tasked with a single or small set of functions and has more limited powers. (See 1 Martinez, Local Government Law (2d ed. 2012).) Special purpose agencies of local government, § 2:16 ["The key distinguishing factor between general purpose and special purpose units is in the scope of delegated powers granted by the sovereign to the entity in question," and "the purposes which a special purpose unit is created to serve are much narrower than those of general purpose units."].) Therefore, for a special purpose agency, such as the District, an "eligible renewable generating facility" under section 2830 must be located on land that the agency *governs in connection with its essential functions*.

---

[20]   The City argues, "[t]he term 'geographical boundary' is different than mere ownership and use of the land; it encompasses a concept concerning the region, jurisdiction, and physical boundaries of the local government," and instead refers to an area "that is governed by the local government in question." We agree, in that it seems self-evident that a city or county's "geographical boundary" may extend beyond a particular parcel of land owned by a city or county, for example.

Here, the record demonstrates that the District "governs" the Hesperia Farms Property in relation to at least one of its essential functions. The District exists to provide two essential functions to the public: water service and wastewater service. As the record demonstrates, the Hesperia Farms Property is subject to the District's authority in connection with its wastewater service function. For example, the District has developed a facility known as the "Hesperia Effluent Management Site" on the Hesperia Farms Property for the purpose of discharging and percolating treated effluent. Specifically, the District conveys its treated effluent directly from the District's Grass Valley Wastewater Treatment Plant into the percolation ponds at the "Hesperia Effluent Management Site" facility on the Hesperia Farms Property. The percolation ponds allow the treated wastewater to then be reintroduced into state's groundwater supply in the Mojave River groundwater basin. The Hesperia Farms Property is therefore fundamental to the wastewater services the District provides to the public—one of the District's two main and essential functions. The District could not complete its wastewater management function without having authority over the Hesperia Farms Property. The Hesperia Farms Property may therefore be properly understood to be considered part of the area over which the District governs, and a renewable energy facility that is developed there would be located within the District's "geographic boundary" for purposes of section 2830.

A review of the history of the statute and legislative history material further supports our interpretation of the statute as applied in this case. As originally enacted in 2008, section 2830 permitted only a "local government" to use the RES-BCT program, which was defined to mean a "a city, county, whether general law or chartered, city and county, special district, school

51

district, political subdivision, or other local public agency, if authorized by law to generate electricity, but shall not mean the state, any agency or department of the state, or joint powers authority." (See Stats. 2008, ch. 540 (Assem. Bill No. 2466), § 1.) In addition, as originally introduced, Assembly Bill No. 2466 did *not* include the "geographical boundary" language.[21] The legislation was only later amended to include in the definition of a benefiting account that it be "located within the geographical boundaries of a local government," and to include in the definition of an eligible renewable generating facility that the facility be "located within the geographical boundary of" a local government. (Assem. Bill No. 2466 (2007-2008 Reg. Sess.), as amended Aug. 4, 2008.) Our review of various legislative history materials from this time period has revealed no information as to why the Legislature revised the introduced legislation to add the "located within the geographical boundaries of a local government" language.

In 2009, section 2830 was amended to permit "campus[es]" to utilize the RES-BCT program as well, as long as the eligible renewable generating facility of the campus is "within the geographical boundary of the city or city and county, if the campus is located in an incorporated area, or county, if the campus is located in an unincorporated area." (See Stats. 2009, ch. 380 (Assem. Bill No. 1031), § 1.)

---

[21] Instead, a benefiting account was originally defined as "an electricity account, or more than one account, mutually agreed upon by a governmental entity and an electrical corporation." (Assem. Bill No. 2466 (2007-2008 Reg. Sess.), as introduced Feb. 21, 2008.) Similarly, the original version of Assembly Bill No. 2466 proposed the following definition of an eligible renewable generating facility: "a generation facility that is an eligible renewable energy resource pursuant to the California Renewables Portfolio Standard Program that is owned or operated by a city, county, city and county, or joint powers agency formed by a city, county, or city and county." (*Ibid.*)

Then, in 2016, the Legislature again amended section 2830 to allow certain joint powers authorities to take advantage of the RES-BCT program by adding them to the definition of "local government." (Stats. 2016, ch. 659 (Assem. Bill No. 1773), § 1.)[22] A " 'local government' " for purposes of section 2830 now also includes "a joint powers authority formed pursuant to the Joint Exercise of Powers Act . . . that has as members public agencies located within the same county and same electrical corporation service territory, but shall not mean the state, any agency or department of the state, other than an individual campus of the University of California or the California State University, or any joint powers authority that has as members public agencies located in different counties or different electrical corporation service territories, or that has as a member the federal government, any federal department or agency, this or another state, or any department or agency of this state or another state." (Stats. 2016, ch. 659 (Assem. Bill No. 1773), § 1.)

Most recently, as we noted in footnote 19 in part III.B.2, *ante*, section 2830 has again been amended by the Legislature to allow tribes to participate in the RES-BCT program. (See Stats. 2021, ch. 141 (Sen. Bill No. 479), § 1, eff. Jan. 1, 2022.) Pursuant to this amendment, an eligible renewable generating facility owned by tribe must also be located "on land owned by or under the jurisdiction of the tribe," while any benefiting account must "belong to a tribe and [be] located on land owned by or under the jurisdiction of the tribe, if the eligible renewable generating facility and electricity account or accounts are wholly located within a single county within which the tribe is

---

22 Between 2009 and 2016, two other sets of amendments were made to section 2830, however those amendments are not relevant to our discussion. (See Stats. 2011, ch. 478 (Assem. Bill No. 512), § 1; Stats. 2012, ch. 162 (Sen. Bill No. 1171), § 161.)

53

located and electrical service is provided by a single electrical corporation, with the account or accounts being mutually agreed upon by the tribe and the electrical corporation."

What becomes clear from the Legislature's additions to section 2830 is that the Legislature was seeking to increase the number and type of entities that can benefit from the RES-BCT program while at the same time avoiding complications that could arise if a governmental entity attempts to obtain energy credits from one electrical corporation but apply those credits to an account serviced by a different electrical corporation.[23]

---

[23] That this has been the Legislature's concern is supported by the legislative history of the 2016 amendment to section 2830, which authorized certain joint powers authorities to participate in the RES-BCT program:

> "At the RES-BCT program[']s formation under [Assem. Bill No.] 2466, JPAs [joint powers authorities] were explicitly excluded because of geographical concerns. These concerns were raised because JPAs across the state are extremely diverse in their goals, size, members, and locations. The territory of a JPA varies and depends on the makeup of its members.
>
> "[¶] . . . [¶]
>
> "Had JPAs been included in [Assem. Bill No.] 2466, contracts between JPAs and . . . IOUs could have included benefit[ ]ing accounts and generation facilities spread out across large geographical areas, crossing county and even state lines and utility territories.
>
> "[¶] . . . [¶]
>
> "[Assem. Bill No. 1773] attempts to address many of the initial concerns which excluded JPAs from the RES-BCT program at the program's inception. Specifically, this bill attempts to limit the geographical size of participating JPAs by allowing participation only by JPAs whose members are in the same county and are served by the same electrical corporation. Furthermore, [Assem. Bill No.] 1773 limits participating JPAs by allowing only JPAs whose benefit[ ]ing . . . accounts belong to members of the

It becomes clear from this review of the legislation's historical context that our interpretation of "geographical boundary of the local government" and our application of that interpretation is consistent with the Legislature's expressed purpose and concerns regarding the RES-BCT program.  All of the land over which the District possesses some authority in connection with its primary service functions, including the Hesperia Farms Property, is located within San Bernardino County and is served by SCE, the electrical corporation with which the District entered into the Interconnection Agreement that is necessary for the District's participation in the RES-BCT program.  Thus, the purpose of section 2830—i.e., the encouragement of local governments to supply energy derived from renewable energy sources in order to meet their own energy demands while avoiding cross-county and cross-energy corporation benefiting and generating accounts—is served by the District's planned development of a renewable generating facility at its Hesperia Farms Property location.

Although the City does not expressly say so, the City's argument that the Hesperia Farms Property is located outside of the District's "geographical boundary" appears to hinge on the idea that an area that is "governed by" the District is equivalent to the District's "service area"—i.e, the outer limit of the area over which the District has been authorized to provide water and/or wastewater services to the public.  There is no dispute that the Hesperia Farms property is not located within District's water and wastewater *service*

JPA and are located within the geographical boundaries of the group of public agencies that formed the JPA . . . or accounts must be mutually agreed upon by the JPA and the electrical corporation."  (Sen. Com. on Energy, Utilities and Communications, Analysis of Assem. Bill No. 1773 (2015-2016 Reg. Sess.) June 21, 2016.)

*area* boundaries.  We are not convinced, however, that the District's service area is equivalent to the "geographic boundary" of a special district for purposes of the RES-BCT program.  In part, we question such a definition because a special district may have different service area boundaries for the different services it provides, making it difficult to discern which service area should define a special district's "geographic boundary."  For example, the record demonstrates that the District's water service boundary is not the same as the District's wastewater service boundary.[24]  Further, we disagree with the idea that a special district may not possess certain limited governing powers that extend beyond that special district's service area, particularly where the area in question is fundamental to the provision of those services.  As result, we do not accept the City's implied contention that the District's "geographical boundary" is equivalent to the District's service area.

We therefore reject the City's additional argument for reversal of the judgment on the ground that the Hesperia Farms Property is not within the

---

[24]     For example, the following figure is taken from a 2014 United States Bureau of Reclamation Study Report regarding the District's future water and energy needs, and it demonstrates how the District's water service sewer/wastewater service boundaries are not coextensive.



Figure 3: Lake Arrowhead Community Services District Map

District's "geographical boundary" and therefore was not eligible for use under the RES-BCT program.

C. *The trial court did not err with respect to its ruling as to the third cause of action*

The City contends that its challenge to the eligibility of a solar farm on Hesperia Farms Property for purposes of the RES-BCT program also undermines the District's finding that there are no feasible alternatives to the Solar Project being located on the Hesperia Farms Property. The City argues that the District's alternatives analysis, which the District used to support its finding that there was no other feasible location than the Hesperia Farms Property for a solar farm project, suffered from "a fatal flaw in that it rests upon the assumption the Hesperia Farms site is an eligible site for a generating facility under the RES-BCT program." As the City explains, under its view of the meaning of the section 2830, the Hesperia Farms Property "is not within the District's geographical boundary," which renders unsupportable the District's conclusion that the Hesperia Farms Property location is the only feasible option.

This remaining contention on appeal also fails. As previously discussed, we have concluded on the merits that the City has failed to establish that the Hesperia Farms Property is not eligible for the RES-BCT program. Thus, the "fatal flaw" that the City points to in the District's analysis (i.e. that it presupposes that the Solar Project would be eligible for RES-BCT program benefits) is no flaw at all. The City has failed to demonstrate that there is insufficient evidence to support the trial court's denial of the writ of mandate as to the City's third cause of action. Accordingly, we affirm.

IV.

DISPOSITION

The judgment of the trial court is affirmed.  The District is entitled to costs on appeal.

McCONNELL, P. J.

WE CONCUR:


IRION, J.


KELETY, J.